Sylvia Martin MANN and R. Allen Martin, Trustees Under Deed of Trust Dated June 26, 1972, for the Benefit of Alana Martin Frumkes, and R. Allan Martin, Individually, Plaintiffs Below, Appellants,

v.

OPPENHEIMER & CO., a Delaware Corporation, Defendant Below, Appellee.

No. 154, 1985.

Supreme Court of Delaware.

Submitted: Oct. 16, 1985.
Decided: Oct. 30, 1986.

William Prickett and Vernon R. Proctor, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Mordecai Rosenfeld (argued), Mordecai Rosenfeld, P.C., of counsel, New York City for appellants.

E. Norman Veasey, Donald A. Bussard, and Thomas A. Beck, of Richards, Layton & Finger, Wilmington, Joseph S. Allerhand (argued), Dennis J. Block, and Myrna S. Levine, of Weil, Gotshal & Manges, of counsel, New York City, for appellee.

Before CHRISTIE, C.J., and HORSEY and MOORE, JJ.

MOORE, Justice:

In this class action charging the defendant Oppenheimer and Company ("Oppenheimer" or "the Company") with fraud in the exchange of its 18% Volume-Indexed Debentures (the debentures), the plaintiffs Sylvia Martin Mann and R. Allan Martin appeal a decision of the Court of Chancery granting summary judgment to Oppenheimer. The complaint alleges that Oppen-

heimer violated Sections 12(2) and 17(a) of the Securities Act of 1933 (the Securities Act),[1] and committed common law fraud in its offer to exchange the debentures for new 12.75% subordinated bonds. The Court of Chancery rejected plaintiffs' claims, denied their request for discovery, and granted Oppenheimer summary judgment on all counts of the complaint. Plaintiffs appeal on four grounds: (1) the refusal to grant pretrial discovery, (2) the grant of summary judgment on the Section 12(2) and common law fraud claims, (3) the denial of a private cause of action under Section 17(a), and (4) the denial of equitable relief.

Addressing the issue as a matter of first impression in this Court, we conclude that there is no private cause of action under Section 17(a) of the Securities Act. Thus, we overrule the earlier Superior Court decision of *Unit, Inc. v. Kentucky Fried Chicken Corp.*, Del.Super., 304 A.2d 320 (1973), to the extent it recognizes such a right, and affirm the trial court on that issue. However, based on the denial of discovery, we reverse as to the Section 12(2) and common law fraud claims. It follows that the question of equitable relief remains open. Accordingly, we remand this case to the Court of Chancery so that the plaintiffs may conduct reasonable discovery to develop facts which, under applicable principles, could defeat summary judgment.

## I.

Oppenheimer is a privately owned, diversified investment services firm. As a registered broker-dealer and a member firm of the New York Stock Exchange, Oppenheimer is subject to the Uniform Net Capital Rule of the Securities and Exchange Commission (Rule 15C3–1), which specifies uniform minimum net capital requirements for its registrants, and is designed to measure the general financial integrity and liquidity, and to control the expansion, of a broker-dealer's business.

In July 1981, Oppenheimer sold $25 million of the debentures which bore an interest rate ranging from 18% to 22%, depending on the trading volume on the New York Stock Exchange. The net proceeds to the Company of $23,805,000, were used to repay existing subordinated liabilities and short-term bank loans. The prospectus disclosed that compliance with the Net Capital Rule "may limit those operations of a firm (such as the Company) which require intensive use of its capital for such purposes as underwriting securities distributions, maintaining the inventory required for firm trading in securities and carrying customer accounts." However, it noted that the Company's liquidity would be enhanced by the proceeds of the offering.

Whatever the effect of the Net Capital Rule, Oppenheimer's ability to redeem the securities was restricted by the terms of the indenture:

No redemption of the Debentures will be permitted prior to July 1, 1986, directly or indirectly, from or in anticipation of moneys borrowed having an effective interest cost which is less than 16%, per annum.

During the relevant period, the debentures yielded the maximum 22% interest. To reduce this expense, on March 2, 1983, Oppenheimer made an exchange offer by which debenture holders would receive $1,275 in principal of new 12.75% interest debentures (new debentures), plus the accrued interest on the old ones, for every $1,000 of debentures exchanged. The offer, according to plaintiffs, twice falsely stated that if a "major portion" of the securities were not exchanged, "the Company *presently intends* to redeem [them] at some time after July 1, 1983." (Emphasis added). Oppenheimer further declared that the new debentures' market value would be greater than the subsequent re-

---

**1.** 15 U.S.C. § 77*l* (2) (1982); 15 U.S.C. § 77q(a) (1982). The two statutes are essentially anti- fraud provisions. See *infra* nn. 6, 8.

demption value of the debentures. Faced with the prospect of redemption, 86% of the debenture holders, representing approximately $21.5 million principle amount of debentures, exchanged these securities for the new bonds. It is not disputed that, but for the indenture restriction, at all relevant times Oppenheimer could have borrowed funds at interest rates below 16%.

The plaintiffs, as trustees of a trust which exchanged its debentures, filed suit on behalf of the trust and all other debenture holders who accepted the "fraudulent and coercive" offer. The plaintiff, Martin, who retained his own debentures, also alleged that he and others similarly situated were injured when Oppenheimer's offer adversely affected the market value of their holdings. The plaintiffs contend that Oppenheimer's statements of an intent to redeem the debentures, if the exchange failed, were false and misleading in violation of Sections 12(2) and 17(a) of the Securities Act, as well as Delaware common law, since the Company lacked sufficient funds, unless borrowed at 16%—then well above the going rate—to effect any such redemption.

Pursuant to Chancery Court Rule 12(b)(6),[2] Oppenheimer moved to dismiss the complaint for failure to state a claim upon which relief could be granted. Appended to its motion were copies of the prospectus, the offering circular, certain Commentaries on indenture provisions from the American Bar Foundation, various unreported judicial decisions, and a specimen debenture certificate. The Vice Chancellor concluded that under Rule 12(b) Oppenheimer's submissions converted the motion to dismiss into a motion for summary judgment under Chancery Court Rule 56.[3]

Mann and Martin sought, but were refused, discovery on the grounds that they had not shown a need for particularized discovery, and because the issue was one of law turning upon the interpretation of documents, especially the old indenture. The Vice Chancellor then granted Oppenheimer summary judgment, holding that (1) plaintiffs had no private cause of action under Section 17(a); (2) because Oppenheimer was "legally" able to redeem the debentures, its announcement of such an intention did not amount to coercion, fraudulent misrepresentation violative of Section 12(2), or common law fraud; and (3) absent a legal basis for plaintiffs' allegations, it was unnecessary to rule on the request for equitable relief.[4] *Mann v. Oppenheimer*, Del.Ch., No. 7275, Walsh, V.C. (April 4, 1985).

## II.

When a party moves to dismiss for failure to state a claim pursuant to Rule 12(b), and submits matters outside the pleadings, the motion will be treated as one for summary judgment under Rule 56. Del.Ch.Ct. Rule 12(b); *Danby v. Osteopathic Hospital Ass'n of Delaware*, Del. Ch., 101 A.2d 308, 315 (1953), *aff'd*, Del. Supr., 104 A.2d 903 (1954).

**2.** The pertinent provision of the rule is as follows:
[T]he following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted ...
Del.Ch.Ct. Rule 12(b).

**3.** The pertinent provision of Chancery Rule 12(b), like its federal counterpart, is:
... If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summa-

ry judgment and disposed of as provided in Rule 56, and *all parties shall be given reasonable opportunity to present all material made pertinent to such a motion* by Rule 56.
Del.Ch.Ct. Rule 12(b) (emphasis added).

**4.** The Vice Chancellor also ruled that Martin had no standing as an individual plaintiff under § 12(2), because he (and other members of his class) did not exchange their debentures and thus were not "purchasers" as required under Section 12(2). However, Martin *et al* still had standing for the common law fraud claim. This part of the decision below was not appealed.

■ Oppenheimer argues pre-emptively that the 12(b) motion need not have been converted to one for summary judgment, because the Vice Chancellor erred in considering the attached documents "matters outside the pleadings," plaintiffs having quoted from the prospectus and the offering circular in their complaint. However, absent a cross-appeal, the appellee may not attack the judgment of the court below with a view to enlarging its own rights or lessening the rights of its adversary. *Hoffman v. Dann*, Del.Supr., 205 A.2d 343, 355 (1964), *cert. denied*, 380 U.S. 973, 85 S.Ct. 1332, 14 L.Ed.2d 269, (1965). *See United States v. American Ry. Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924); *Chrysler Corp. v. Quimby*, Del.Supr., 144 A.2d 885, 886 (1958). As a result, Oppenheimer may not now challenge the very circumstances which its own tactics precipitated.

■ Moreover, when issues are decided on summary judgment, the parties must have a reasonable opportunity to present all facts pertinent to the motion. Del. Ch.Ct. Rule 12(b); *Danby*, 101 A.2d at 315. This is so because the entire record must be read in the light most favorable to the non-moving party. Since a party opposing summary judgment is both entitled, and expected, to come forward with admissible evidence showing the existence of a genuine issue of material fact, the purport of Chancery Rule 12(b) is manifest. Once the non-movant has been afforded this opportunity, the burden again shifts to the movant to demonstrate the absence of such disputes. *Brown v. Ocean Drilling & Explo-*

*ration Co.*, Del.Supr., 403 A.2d 1114, 1115 (1979); *Nash v. Connell*, Del.Ch., 99 A.2d 242, 243 (1953). Only then may the trial court conclude, based on the entire record, that there is no genuine issue of material fact, and enter judgment as a matter of law. Del.Ch.Ct. Rule 56(c); *Bader v. Sharp*, Del.Ch., 110 A.2d 300, 302 (1954), *aff'd*, Del.Supr., 125 A.2d 499 (1955). When the Court of Chancery grants summary judgment notwithstanding genuine issues of material fact, this Court must reverse. *See Brown*, 403 A.2d at 1115. Consistent with Chancery Rule 12(b), the same result obtains when parties are denied a reasonable opportunity to develop material facts in opposition to such a motion.

### A.

■ In granting summary judgment on the Section 12(2) [5] and common law fraud claims, the trial judge held that the issue was one of law "turning upon the interpretation of documents [the prospectus and the offering circular] which are concededly genuine." *Mann v. Oppenheimer*, Del. Ch., C.A. No. 7275, slip op. at 2, Walsh, V.C. (April 4, 1985). While the legal ability to redeem may be fairly discerned from a study of the documents, Oppenheimer's claimed intent to redeem may not comport with factual reality. Plaintiffs' complaint alleges that Oppenheimer's false and misleading statements of intent had an improper coercive effect on the exchange. In the prospectus and offering circular the only expressions of defendant's intent to redeem are the very declarations which plaintiffs

---

**5.** The pertinent provision of Section 12(2) provides:

　Any person who—
　　(2) offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not

sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
　shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
15 U.S.C. § 77*l* (2) (1982).

claim were fraudulent. The documents presented hardly satisfy Oppenheimer's burden of demonstrating the absence of a material issue regarding its intent. Under the circumstances, the granting of summary judgment on such a meager record cannot stand.

Generally, parties may obtain discovery of any matter not privileged which is relevant to the subject of the pending action. Del.Ch.Ct. Rule 26(b)(1) [6]. Federal authority indicates that plaintiffs must have access to the relevant materials through discovery before summary judgment can be granted, especially when the information is exclusively within defendant's control. *Johnson v. RAC Corp.*, 491 F.2d 510, 513–14 (4th Cir.1974); *Steinberg v. Shearson Hayden Stone, Inc.*, 546 F.Supp. 699, 701–02 (D.Del.1982). While these federal precedents are not binding, they are persuasive since our Chancery Rules are parallel to the Federal Rules of Civil Procedure. *See Canaday v. Superior Court*, Del.Supr., 119 A.2d 347, 352 (1955); *Patents Management Corp. v. John K. O'Connor, et al.*, C.A. No. 7110, Walsh, V.C. (June 10, 1985).

■ The application of the discovery rules is subject to the exercise of the trial court's sound discretion. *Dann v. Chrysler Corp.*, Del.Ch., 166 A.2d 431, 432 (1960). Such discretion is guided by the rule that discovery should be permitted unless the court "is satisfied that the administration of justice will be impeded by such an allowance." *Fish Engineering Corp. v. Hutchinson*, Del.Supr., 162 A.2d 722, 725 (1960). Our scope and standard of review derive from those principles. *Pitts v. White*, Del. Supr., 109 A.2d 786, 788 (1954).

■ Since Oppenheimer essentially controls the relevant information, material to the issue of intent, plaintiffs can only develop facts to contest the motion for summary judgment through the discovery process. To deny them that right, and thus

extinguish plaintiffs' action at its threshold, does not comport with principles of judicial discretion, expecially when there is no indication that discovery on the relatively narrow issue of Oppenheimer's intent would interfere with the administration of justice. Reversal, under the circumstances, is mandated. Del.Ch.Ct. Rule 12(b).

### B.

Relying principally upon the indenture terms and two analogous federal cases, the trial court ruled as a matter of law that because Oppenheimer could redeem under circumstances which were technically possible, the company's expression of that intent was neither fraudulent nor misleading. Following the reasoning in *Franklin Life Insurance Co. v. Commonwealth Edison Co.*, 451 F.Supp. 602 (S.D.Ill.1978), *aff'd per curiam*, 598 F.2d 1109 (7th Cir.1979), *cert. denied*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979) and *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F.Supp. 1529 (S.D.N.Y.1983), the Vice Chancellor held that under the terms of the indenture Oppenheimer could effect a redemption by borrowing funds at 16% or greater interest, or by becoming a public company and issuing equity, among other alternatives.

■ The rights of debenture holders are controlled by the terms of the indenture under which the securities are issued. *Wolfensohn v. Madison Fund, Inc.*, Del. Supr., 253 A.2d 72, 75 (1969); *Harff v. Kerkorian*, Del.Ch., 324 A.2d 215, 222 (1974), *aff'd in part, rev'd in part*, Del. Supr., 347 A.2d 133 (1975). Here, Oppenheimer's right to redeem is determined by the following indenture limitation:

No redemption of the Debentures will be permitted prior to July 1, 1986, directly or indirectly, from or in anticipation of moneys borrowed having an effective interest cost which is less than 16%, per annum.

---

6. The pertinent provision of the rule provides:
   ... Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action ...
   Del.Ch.Ct. Rule 26(b)(1).

On appeal, the plaintiffs argue that this standard provision, as interpreted by *Franklin Life* and *Morgan Stanley, supra,* forbids a redemption by means of borrowed funds at all times relevant here. Given Oppenheimer's status as a private company, and the strictures of the Net Capital Rule, plaintiffs contend that it was quite unlikely that Oppenheimer would be able to raise equity funds to effect the redemption. Thus, under all the circumstances the plaintiffs argue that the threatened redemption was not a realistic alternative. However, the plain language of the indenture, in light of the interpretations in *Franklin Life* and *Morgan Stanley,* demonstrates the redemption terms to be far less restrictive. On its face, the provision indicates that money borrowed at less than 16% interest may not be used, directly or indirectly, to effect a redemption. Plaintiffs suggest that for the clause to have any meaning it must bar redemption when prevailing interest rates are below 16%. While that may be the practical result, the terms of the indenture are not so limited. Thus, plaintiffs turn to prior cases for support. However, an analysis of those decisions does not sustain the argument.

In *Franklin Life,* the restriction was that certain 9.44% preferred shares issued by Commonwealth Edison could not be redeemed "through refunding, directly or indirectly, by or in anticipation of" debt carrying an interest cost, or equity bearing a dividend cost, below 9.44%. *Franklin Life,* 451 F.Supp. at 605, 613. Commonwealth Edison redeemed the shares with money acquired from an issue of common stock. Although the company was also then borrowing funds at less than 9.44%, the redemption was upheld: "[T]he clause forbidding redemption through refunding by or in anticipation of debt, requires an examination of only *the source of the funds actually used* to achieve the redemption." 451 F.Supp. at 614 (emphasis added).

In *Morgan Stanley,* ADM Midland Company (ADM) issued certain 16% debentures in May, 1981. The indenture provided that the bonds were not redeemable before a certain date "pursuant to such option from the proceeds, or in anticipation, of the issuance of any indebtedness ... [if] the interest cost or interest factor applicable thereto ... shall be less than 16.08% per annum." *Morgan Stanley,* 570 F.Supp. at 1531. Subsequent to the issuance of the securities, ADM twice borrowed funds at less than 16.08%. During that time, the company also raised money with two common stock offerings. ADM then announced on June 1, 1983, that it would redeem the debentures with the proceeds from the two stock offerings.

Morgan Stanley, which held a large block of debentures, filed an action claiming that the redemption was barred by the indenture agreement, and that the use of stock proceeds was a mere "juggling of funds" to avoid the limitation. Adopting the "source" test of *Franklin Life,* the court upheld the redemption. The court also quoted The American Bar Foundation's *Commentaries on Model Debenture Indenture Provisions* (The Commentaries):

> [I]nstead of an absolute restriction [on redemption], the parties may agree that the borrower may not redeem with funds borrowed at an interest rate lower than the interest rate in the debentures. *Such an arrangement recognizes that funds for the redemption may become available from [sources] other than borrowing,* but correspondingly recognizes that the debenture holder is entitled to be protected for a while against redemption if interest rates fall and the borrower can borrow funds at a lower rate to pay off the debentures.

*Morgan Stanley,* 570 F.Supp. at 1535 (*citing* American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions* at 477 (1971)).

The court concluded: "We read this comment as pointing to the *source* of funds as the dispositive factor in determining the availability of redemption to the issuer ..." *Morgan Stanley,* 570 F.Supp. at 1535.

The court also held that debt holders would not be left unprotected by the "source" rule: "An issuer contemplating redemption would still be required to fund such redemption from a source other than lower-cost borrowing, such as reserves, the sale of assets, or the proceeds of a common stock issue." *Id.* at 1536.

As plaintiffs correctly observe, *Franklin Life* and *Morgan Stanley* are distinguishable in that they involved redemptions with equity funds, whereas no such source has yet been demonstrated by Oppenheimer. Indeed, plaintiffs forcefully argue that recourse to equity capital is the least likely redemption method available to the Company, because it (1) is privately held, and (2) is subject to the stringent requirements of the Uniform Net Capital Rule of the Securities and Exchange Commission. These factors, coupled with the indenture limitation, point to but one conclusion according to plaintiffs—the coercive redemption threat was fraudulent since the Company knew it had no practical means of carrying it out. Whether that in fact is so awaits another day. However, plaintiffs fail to note another critical distinction: in the prior cases, the interest floor on the source of redemption funds matched the rate the securities paid, while Oppenheimer could borrow funds at 16%, a rate lower than the range of its obligation under the debentures (18%–22%). As a result, although it was unprofitable for Commonwealth Edison or ADM to redeem with proceeds from debt more costly than the securities, Oppenheimer could redeem with borrowed funds less expensive than the interest cost of the debentures. Likewise, the reasoning from the Commentaries applies to redemption provisions, such as in *Franklin Life* and *Morgan Stanley*, under which issuers may not redeem with funds borrowed at a cheaper rate than that which the security pays. Here, Oppenheimer faced no such restriction.

The source rule prevents a redemption, directly or indirectly, by means of funds acquired in a manner forbidden by the indenture. The limitation upon an Oppenheimer redemption applied only when the source of the funds was money borrowed at less than 16%. Unlike the prior cases, there was greater latitude to redeem with borrowed money.

Oppenheimer also had the option of becoming a public company, issuing equity securities, and using the proceeds of the public offering to redeem as in *Franklin Life* and *Morgan Stanley*. Any implication to that effect in the exchange offer might be technically accurate. However, fraud does not turn on bare legal niceties. The element of intent remains, and on that point the record was prematurely closed.

Mann and Martin also contend that Oppenheimer had a duty to disclose the anticipated source of the redemption funds. However, securities laws require neither the disclosure of indefinite or contingent plans nor the prediction of future actions. *Crane Co. v. Harsco Corp.*, 509 F.Supp. 115, 119 (D.Del.1981). Because the best method of funding the redemption (and perhaps the redemption itself) was contingent upon the success or failure of the exchange offer, Oppenheimer was under no obligation to disclose the source of its redemption funds. However, it clearly could not mislead the public by expressions of intent which it knew, or had reason to know, it would not or could not pursue. It is the element of intent upon which plaintiffs' claims must turn, and given all the previously discussed factors, reasonable discovery should not be denied them in opposing a motion for summary judgment.

### III.

Mann and Martin also appeal the dismissal of their claim under Section 17(a) of the Securities Act.[7] Although this Court has

---

7. The relevant text of Section 17(a) provides:
   (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or

not addressed the subject, the existence of such a private cause of action was earlier recognized by the Superior Court in *Unit, Inc. v. Kentucky Fried Chicken Corp.*, Del.Super., 304 A.2d 320, 324–26 (1973).

The availability of an implied private right of action under Section 17(a) remains unresolved in the federal courts. The United States Supreme Court has declined to address the question. *See Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 689, 100 S.Ct. 1945, 1951–52, 64 L.Ed.2d 611 (1980); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733 n. 6, 95 S.Ct. 1917, 1924 n. 6, 44 L.Ed.2d 539 (1975). The federal circuit courts of appeal are equivocal on the point.[8] Delaware's federal district court has held that no such right of action exists. *Hill v. Equitable Trust Co.*, 562 F.Supp. 1324, 1345 (D.Del. 1983); *Hill v. Der*, 521 F.Supp. 1370, 1378 (D.Del.1981). While these latter precedents are not binding, since the Securities Act confers concurrent jurisdiction upon State Courts "of all suits in equity and actions at law brought to enforce any liability or duty" created by the Act,[9] their analysis is important to us.

We begin by considering such guidance as the Supreme Court of the United States has furnished to date. In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), a four-part test was established to determine whether a private remedy should be inferred from a statute:

... First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," ... that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? *Id.* at 78, 95 S.Ct. at 2088 (citations omitted).

The central inquiry is whether Congress intended to create a private cause of action, either expressly or by implication. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). This modified test is based on the first three *Cort* factors: the language and focus of the statute, the legislative history, and the underlying purposes. *Id.* at 575–76, 99 S.Ct. at 2489.

In *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court relied only on the language of the statute and on Congressional intent in denying a private cause of action under the Investment Advisors Act of 1940:

... But the mere fact that the statute was designed to protect advisers' clients does not require the implication of a private cause of action for damages on their behalf ... The dispositive question re-

---

8. *See, e.g., Stephenson v. Calpine Conifers II, Ltd.*, 652 F.2d 808, 815 (9th Cir.1981); *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979); *Newman v. Prior*, 518 F.2d 97, 99 (4th Cir.1975) (private cause of action implied). *Cf. Landry v. All American Assur. Co.*, 688 F.2d 381, 389 (5th Cir.1982) (no private cause of action implied); *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 790 (8th Cir.1967).

9. Securities Act, Section 22(a). 15 U.S.C. § 77v(a) (1982).

---

by the use of the mails, directly or indirectly—
   (1) to employ any device, scheme, or artifice to defraud, or
   (2) to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
   (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
15 U.S.C. § 77q(a) (1982).

mains whether Congress intended to create any such remedy. Having answered that question in the negative, our inquiry is at an end.

*Id.* at 24, 100 S.Ct. at 249 (citations omitted).

A finding of intent is more likely where the statutory language confers a right directly upon a class of persons, but less likely where Congress "instead has framed the statute simply as a general prohibition or a command to a federal agency." *Universities Research Ass'n, Inc. v. Coutu,* 450 U.S. 754, 772, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981).

An analysis of Section 17(a) under the modified *Cort* test demonstrates that no private cause of action arises under the statute. The first inquiry is whether the statute was created for the especial benefit of plaintiffs, such as Mann and Martin, and whether the statute creates a federal right in their favor. Section 17(a) acts as a general prohibition forbidding those who offer or sell securities from employing fraudulent schemes or engaging in transactions which operate as a fraud on purchasers. While purchasers are clearly beneficiaries, the provision does not grant them a federal right. "The question is not simply who would benefit from the [statute], but whether Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981).

In *Sierra Club,* the Court denied a private cause of action under a statute barring construction on the nation's navigable waters without certain approval. This denial should be compared with the grant of a private cause of action under Section 901 of Title IX of the Educational Amendments of 1972 [10] in *Cannon v. University of Chica-*

*go,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). In a footnote, *Cannon* distinguished statutes which confer a right directly upon a class of persons from those which "create duties on the part of persons for the benefit of the public at large." *Id.* at 690 n. 13, 99 S.Ct. 1954 n. 13. The mention of "purchasers" in Section 17(a) notwithstanding, the thrust of the law is to impose a duty upon sellers to abjure fraud, untrue statements of material fact, and misleading omissions of material facts. By its terms the law does not appear to create a special federal right in purchasers who are defrauded, or in the general public a right to a market free from fraud. Under the circumstances, we conclude that the first part of the *Cort* test weighs against the existence of a private cause of action under Section 17(a).

The second element of the modified *Cort* test asks whether there is any explicit or implicit intent on the part of Congress to create a private remedy. The legislative history of the Securities Act indicates no such intent. Sections 11 [11] and 12 of the Act create explicit civil remedies, while Section 17(a) does not. The House Committee report points only to Sections 11 and 12 as providing civil remedies [12] and there is no mention of civil liability under Section 17(a). *Landry v. All American Assurance Co.,* 688 F.2d 381, 389 (5th Cir.1982).

The overall regulatory scheme of the Act likewise evinces no intent to create a civil remedy under Section 17(a). *Landry,* 688 F.2d at 389–91. The Delaware federal district court, in *Hill v. Der,* noted that the two important substantive provisions of the Act (Sections 5 and 17(a)) have corresponding express civil remedies in Sections 11 and 12, which in turn have certain restrictions and limitations which

---

10. 20 U.S.C. § 1681(a) (1982). In relevant part, the statute provides:
(a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance ...

\*    \*    \*    \*    \*    \*

11. 15 U.S.C. § 77k (1982).

12. H.R.Rep. No. 85, 73rd Cong., 1st Sess. 9–10 (1933).

would be circumvented by a private cause of action under Section 17(a). *Hill v. Der,* 521 F.Supp. at 1376–77 (*quoting* 3 L. Loss, *Securities Regulation* at 1785 (2d ed. 1961)). *See Landry,* 688 F.2d at 390. The failure to provide a potential express remedy is not dispositive of the issue, but is strong evidence that Congress did not intend to authorize such an action. *See Transamerica Mortgage Advisors,* 444 U.S. at 21–22, 100 S.Ct. at 248; *Touche Ross & Co. v. Redington,* 442 U.S. at 572, 99 S.Ct. at 2487; *but see Cannon,* 441 U.S. at 711, 99 S.Ct. at 1965.

▆▆ Because we find no intent to create a private remedy in either the statutory language or the legislative history and overall scheme of the Act, it follows that we must deny Mann and Martin a private cause of action under Section 17(a). Although such civil actions arguably would further enforce the Act, and thus be consistent with its underlying purposes, this alone will not confer a private remedy. *See Transamerica Mortgage Advisors,* 444 U.S. at 24, 100 S.Ct. at 249.

Plaintiffs argue that Section 17(a) implies a private remedy, because its language closely parallels that of Section 10(b) of the Securities Exchange Act of 1934. Section 10(b) clearly confers a private remedy. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–83, 103 S.Ct. 683, 686–87, 74 L.Ed.2d 548 (1983). There are, however, significant differences between the statutes. For example, scienter on the part of the defendant is an element of a Section 10(b) violation. *Id.* at 382, 103 S.Ct. at 687. Scienter is required in a violation of Section 17(a)(1), but negligence will suffice for a violation of Sections 17(a)(2) and (3). *Aaron,* 446 U.S. at 689–701, 100 S.Ct. at 1952–53. The two statutes also operate differently within their respective Acts:

It is one thing to imply a private right of action under § 10(b) or the other provisions of the 1934 act, because the specific liabilities created by §§ 9(e), 16(b), and 18 do not cover all the variegated activities with which that act is concerned. But it is quite another thing to add an implied remedy under § 17(a) of the 1933 act ... Within the area of §§ 5 and 17(a), §§ 11 and 12 (unlike §§ 9(e), 16(b), and 18 of the 1934 act) are all-embracing ...

*Hill v. Der,* 521 F.Supp. at 1376–77 (*quoting* 3 L. Loss, *Securities Regulation* at 1785 (2d ed. 1961)).

Finally, the federal circuit courts which have found a private remedy generally have done so by following the analysis in Judge Friendly's concurrence in *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2nd Cir.1968), *cert. denied sub nom, Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Judge Friendly noted that because Section 10(b) and Section 17(a) were so similar, there seemed little practical point in denying a private remedy under Section 17(a). However, that proposition carries less weight in light of the *Cort* test and recent developments in securities laws, including *Aaron.*

The application of the modified *Cort* test to Section 17(a) demonstrates that Mann and Martin have no standing under that statute. In light of recent United States Supreme Court rulings, we find previous cases to the contrary to be of less value than holdings such as *Landry* and *Hill v. Der.* Accordingly, we are constrained to overrule the earlier decision of the Superior Court in *Unit, Inc. v. Kentucky Fried Chicken Corp.,* Del.Super., 304 A.2d 320 (1973), insofar as it recognized the existence of a Section 17(a) private cause of action. The grant of summary judgment for Oppenheimer on this issue is, therefore, affirmed.

## IV.

The trial court ruled that because there was no legal basis for plaintiffs' allegations of fraud, the question of equitable relief was moot. In view of our rulings today, that matter remains open upon remand. While Oppenheimer argues that plaintiffs have an adequate remedy at law, fraud actions, depending on their facts, may sound in equity or law. *See Stephenson v.*

*Capano Development, Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983). In any event, the issue is premature. However, we note for the guidance of the trial court that if the question primarily comes down to the adequacy of plaintiffs' legal remedy, and no facts support a claim for equitable relief, the result is not dismissal, but removal to the Superior Court pursuant to 10 *Del.C.* § 1902.

For the foregoing reasons, the decision of the Court of Chancery is AFFIRMED in part, but REVERSED on the issues of Oppenheimer's alleged misleading, fraudulent and coercive statements of intent. The matter is REMANDED for further proceedings consistent herewith.