716 So.2d 1172 (1998)
MUTUAL SAVINGS LIFE INSURANCE COMPANY, et al.
v.
JAMES RIVER CORPORATION OF VIRGINIA and Merrill Lynch, Pierce, Fenner & Smith, Inc.
1961506.
Supreme Court of Alabama.
June 19, 1998.
*1174 J. Michael Rediker, Peyton D. Bibb, Jr., and Thomas L. Krebs of Ritchie & Rediker, L.C., Birmingham; and J. Timothy Kyle of Russell, Straub & Kyle, Decatur, for appellants.
Thomas E. Spahn and Thomas McGonigle of McGuire, Woods, Battle & Boothe, L.L.P., Richmond, VA; Michael L. Edwards and Edward S. Allen of Balch & Bingham, Birmingham; and John S. Key of Eyster, Key, Tubb, Weaver & Roth, Decatur, for appellee James River Corp. of Virginia, on original submission.
N. Lee Cooper, Patrick C. Cooper, and Carranza Pryor of Maynard, Cooper & Gale, P.C., Birmingham, for appellee Merrill Lynch & Company, Inc., on original submission.
Thomas E. Spahn and Thomas McGonigle of McGuire, Woods, Battle & Boothe, L.L.P., Richmond, VA; Michael L. Edwards and Edward S. Allen of Balch & Bingham, Birmingham; John S. Key of Eyster, Key, Tubb, Weaver & Roth, Decatur; Patrick C. Cooper of Maynard Cooper, Frierson & Gayle, P.C., Birmingham, for appellees James River Corp. of Virginia and Merrill Lynch & Company, Inc., on application for rehearing.
William T. Stephens, general counsel, Retirement Systems of Alabama, for amicus curiae Retirement Systems of Alabama.

On Application for Rehearing
HOOPER, Chief Justice.
The opinion of April 17, 1998, is withdrawn, and the following opinion is substituted therefor.
The plaintiffs in this class action invested in 30-year 10.75% debentures issued by James River Corporation of Virginia. Merrill Lynch, Pierce, Fenner & Smith, Inc., was the dealer-manager for a tender offer made by James River to the bondholders. The tender offer is the subject of this dispute. The plaintiffs are Mutual Savings Life Insurance Company, Transamerica Occidental Insurance Company, and Larry Wasserman. The class includes Protective Life Insurance Company, individual investors; mutual benefit societies; and small institutional investors. The plaintiffs named James River and Merrill Lynch as defendants.
The plaintiffs alleged that James River, with the knowing assistance and active encouragement of Merrill Lynch, wrongfully, fraudulently, and prematurely called, retired and refunded with lower-rate debt its $250,000,000 issue of 10.75% debentures. The company issued these 30-year bonds in 1988, and the tender took place in 1992. James River bought back the tendered bonds with the proceeds of a sale of $200,000,000 in notes at 6.75%. The bonds that were not tendered were redeemed with the proceeds of an issuance of preferred stock. The investors claim that this retiring of the bonds violated a clause in their contract known in the bond market as a "non-refund covenant."

Introduction
A brief explanation of the financial terminology used in this case will be helpful. The plaintiffs invested in 10.75% debentures, also known as bonds. A contract known as an indenture governs a bond issuance. One of the key provisions of an indenture defines the ability of the issuer to buy back the bond before the latest possible maturity date. The most common way this is done is through a call and redemption. A redemption occurs when the issuer of a bond compels the bondholder to sell back the bond at a specified price. The indenture defines the call price the price at which the redemption takes place.
However, certain limitations exist. The indenture in this case (as in most all indentures) prohibited the issuer from paying for the redeemed bonds with money borrowed at an interest rate lower than that of the *1175 bond10.75% in this case. The issuer must pay for the redeemed bonds with qualified funds (also known as "clean cash"). Thus, the money used to redeem the bonds must be from a qualified source. Callable bonds may be called and redeemed at any time as long as they are paid with qualified funds.
An issuer of bonds also is entitled to make a tender offer at any time for the bonds. Unlike a call and redemption, a tender offer is not governed by the indenture. A company may make a tender offer for noncallable bonds. Because a tender offer is not governed by the indenture, there are no restrictions on the type of funds that an issuer may use to buy back tendered bonds. In other words, an issuer can use lower-rate borrowed money to pay for tendered bonds. Also, when a tender offer is made, the issuer must pay a premium to the bondholder that it would not have to pay if it called the bonds. For example, the call price in this case was $1,086.00 per $1,000 par value, and the tender price was $1,093.75 per $1,000 par value. Therefore, a tender offer is different from a call and redemption.
When a tender offer is made, the bondholder may accept or hold. By holding, the bondholder rejects the tender offer. In this case, James River made a tender offer to buy back its 30-year 10.75% bonds. In the letter notifying bondholders of the tender offer, James River expressed its intention to call any bonds that were not tendered. On the day that the tender offer expired, James River called all of the bonds. Ninety-eight percent of the bondholders accepted the tender offer, while the other 2% of the bondholders chose to have their bonds called. James River paid the bondholders who accepted the tender offer with the proceeds from the sale of $200,000,000 worth of 6.75% medium-term notes. Thus, James River bought back the tendered bonds with money that was borrowed at a rate lower than 10.75%. James River then redeemed the remaining 2% of the bonds. It paid for the redeemed bonds with qualified fundsthe proceeds of the issuance of preferred stock. The investors claim that the process of retiring these bonds violated the redemption clause in the indenture because James River replaced the debt with lower-rate debt.
This case involves the interpretation of one paragraph in the contract between James River and the investors regarding redemption of the bonds. That paragraph reads:
"Prior to October 1, 1998, no redemption of Debentures due October 1, 2018, may be made directly or indirectly, in whole or in part, from or in anticipation of the proceeds (or any part of the proceeds) of any moneys borrowed by or for the account of the Company which have an effective interest cost to the Company (calculated in accordance with generally accepted financial practice) of less than 10.75% per annum."
(Emphasis added.) We interpret this paragraph to mean that James River cannot redeem the bonds before the date specified by using money borrowed at a rate lower than the rate at which it had issued the bonds 10.75%.
The plaintiff investors claimed that James River, with the assistance of Merrill Lynch, breached its contract with them by refunding its bonds in violation of the redemption clause. They also made several tort claims based on the defendants' failure to inform them that the company did not have sufficient qualified funds and on James River's failure to fully disclose its plan to retire the bonds. The investors also made a claim under the Trust Indenture Act ("TIA"), which provides a cause of action when an issuer of bonds has defaulted in payments of interest or principal. The investors also made a separate claim against Merrill Lynch alleging tortious interference with a business relation. The trial court certified a class for the breach-of-contract claim. However, the trial court denied class certification on the tort claims because the laws of each investor's home state would control the claims.
The trial court entered a summary judgment for the defendants on the breach-of-contract claim, and it dismissed the tort claims under Rule 12(b)(6), Ala.R.Civ.P. The trial court dismissed the TIA claim because the bondholders had received all of the interest to which they were entitled. Also, the trial court entered a summary judgment for *1176 Merrill Lynch on the tortious-interference claim because that claim was dependent on the breach-of-contract claim, which the trial court disposed of by a summary judgment. The plaintiffs appeal all aspects of the trial court's ruling.
We hold that there was not substantial evidence to counter the defendants' summary judgment motion as to the breach-of-contract claim, the tortious-interference claim, and the TIA (Trust Indenture Act) claim. The trial court properly dismissed the tort claims because the investors did not present a cognizable cause of action. Finally, we conclude that the trial court properly denied class certification as to the tort claims. We affirm the judgment of the trial court.

Breach of Contract
The investors claimed that James River breached the contract by buying back the bonds with money borrowed at a lower rate than the rate at which it had issued the bonds. The trial court entered a summary judgment for the defendants on this issue. "In reviewing the disposition of a motion for summary judgment, we utilize the same standard as that of the trial court in determining whether the evidence before the court made out a genuine issue of material fact." Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988). When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala. 1989). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). On a motion for summary judgment, this court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).
The investors argue that the defendants breached the contract in order to save James River several million dollars per year in interest payments. They argue that the tender offer was, in effect, a redemption. They claim that the sole purpose for making the tender offer was to refund the bonds, i.e., James River wanted to replace higher-rate debt with lower-rate debt. The investors claim that such a refunding violated the indenture because James River bought back the tendered bonds with money borrowed at a rate less than 10.75%.
The investors also claim that the defendants participated in what has become known as a "simultaneous tender and call" (STAC). They claim that James River, in essence, made its tender offer at the same time that it called the bonds. Because it did so, the investors claim, they were coerced into accepting the tender offer. They argue that this would allow James River to obtain a better rate than it would have received had it bought back the bonds at the call price. They argue that James River accomplished the tender/call so that it could retire the bonds without having to comply with the redemption clause. This is the case because tendered bonds can be bought back with money borrowed at a lower rate than the issue rate. The investors claim that they were faced with the "threat" of accepting the tender offer (with only a slightly higher premium than the call price) or being forced to sell back their bonds at the call price. The investors' major objection to the STAC process is that it is coercive. In a simultaneous tender and call situation, they argue, the investor, knowing the bonds will be redeemed in the call anyway, effectively has no choice but to accept the tender offer.
The trial court determined that the tender offer made by James River must be considered separately from the call. Therefore, the trial court found that the tender and call were not simultaneous. We agree with the trial court. It is first necessary to determine whether the tender offer was distinguishable from a call. The trial court set out a three-part test for making this determination:
"[W]hen a tender offer is made, the issuer must include a premium over the redemption price or market price which is handsome enough to attract debenture holders to the offer. Second, in a tender offer the *1177 issuer must aggressively solicit acceptances of the offer, often with the assistance of an outside manager. In contrast, the indenture trustee is neither permitted nor required to solicit acceptances, but merely to give notice of the call for redemption. Most importantly, a call for redemption is not an `offer' to redeem, but is a contractually binding demand upon the debenture holders, who have no choice in the matter. On the other hand, a tender offer is not binding and may be voluntarily rejected or accepted in the holders' discretion."
The trial court determined that the offer made by James River was a tender offer rather than a call. We agree. There was a premium over the call price for tendering the bonds. Also, James River employed Merrill Lynch to assist it in soliciting acceptances of the offer. Finally, the tender offer was not binding and the bondholders did not have to accept it. In its letter announcing the offer, James River stated:
"Neither the Company nor Merrill Lynch is recommending that you or any other Bondholder tender or refrain from tendering any or all Bonds owned. Each Bondholder must make an individual decision whether to tender Bonds, and if so, how many Bonds to tender based on personal financial needs and objectives."
Thus, the decision to accept the offer was voluntary. We find no error in the trial judge's holding that the offer was a tender offer. Thus, we conclude that James River did not violate the terms of the contract, because the tender offer was not subject to the indenture and, therefore, was not subject to the limitation regarding the use of money borrowed at a lower rate. The trial judge correctly stated: "Since the non-refund covenant does not apply to tender offers, James River's use of lower interest cost debt proceeds to purchase the debentures is an immaterial fact."
The restrictions in the indenture regarding the lower-rate borrowed money apply only to redemptions. The trial judge correctly referred to the fact that the indenture did not broadly define "redeem" to encompass a tender offer or other mode of acquisition. The indenture also failed to mention any limitations on the use of a tender offer to buy back the bonds. The trial judge stated, "Tender offers for nonrefundable debentures clearly appear repugnant to the broad purpose underlying the non-refund covenant. Nonetheless, the Court must give meaning to the express terms set forth in the redemption provisions of the contract documents." If the investors had intended to restrict the use of tender offers to retire the bonds, then they should have included in the indenture a provision that would do that.
The next question we must address is whether the tender and the call were simultaneously made in order to coerce the investors to accept the tender offer. We hold that the trial court correctly determined that the tender and the call should be considered separately. First, we note that the investors took the risk that their bonds would be called at any time, by buying callable bonds. They could have purchased noncallable bonds (at a lower interest rate) if they wanted long-term certainty in their investment. Coercion is a contracted-for element (inherent in the indenture) of a redemption of callable bonds. The issuer has the right to call the bonds at any time. Also, in this case, the tender was a separate voluntary transaction that the investors did not have to accept. The investors could have exercised their right to hold the bonds. In fact, one of the plaintiffs, Larry Wasserman, did not accept the tender offer. He chose to wait for the call and redemption.
At worst, the combined tender offer/redemption notice was designed to exert legitimate economic pressure on most of the debenture holders, who would logically choose to receive the higher tender price instead of the lower redemption price. James River could have called all the bonds without making a tender offer. The tender offer, which resulted in a slightly higher rate of return than the redemption, offered a benefit to the bondholders above that offered in the redemption. The exertion of such economic pressure did not violate the express terms of the indenture. James River's exercise of its ability to effect a mandatory redemption with the proceeds of a preferred stock issuance did not violate the indenture. Thus, James *1178 River could, pursuant to the indenture, make a tender offer with borrowed funds followed by a mandatory redemption with the preferred stock proceeds. To the extent debenture holders are dissatisfied with such an arrangement, they should require issuers to prohibit such arrangements in future indentures.
Because we conclude that the tender offer was separate from the call, the only remaining question is whether James River used qualified funds to buy back the redeemed bonds (2% of the bonds). It is undisputed that James River paid for the redeemed bonds with the proceeds of the issuance of preferred stocka qualified source for the money. The plaintiffs argue that the practical effect of the proffered tender (with an announced future call) produced the same result that would have occurred if James River had simply called all the bonds by using the lower rate debt. However, that result-focused argument ignores the fundamental difference between a tender and a call. The language of the indenture clearly indicates that the non-refund covenant refers to an involuntary call and redemption. The tender offer was a separate transaction that 98% of the investors voluntarily accepted.
The investors contend that the language of the indenture stating that no redemption could be made "directly or indirectly, in whole or in part," with unqualified funds requires the Court to apply an "underlying economic reality" test. The investors cite Shenandoah Life Ins. Co. v. Valero Energy Corp., (No. 9032, June 21, 1988) 14 Del. J. Corp. L. 396 (Del. Ch.1988) (not published in Atlantic Reporter), in which similar language was at issue, and they ask this Court to focus on the final result of the complete transaction. The investors urge that, under Shenandoah, if it is found that the redemption of the bonds, albeit lawfully made with qualified funds, would not have occurred but for a tender for other bonds using unqualified funds, then an indirect redemption with unqualified funds has occurred. James River responds by pointing out that the courts in Shenandoah and Morgan Stanley & Co. v. Archer Daniels Midland Co., 570 F.Supp. 1529 (S.D.N.Y.1983), also dealing with refund limitation language, confined their scrutiny to analyses of the funds actually used to redeem. We would add that both courts in those cases ruled that the defendants had not violated the subject indentures. We also note that those courts did not restrict their analyses to the result alone, but studied the economic realities underlying the subject transactions. However, those courts used the "source of funds" rule, a rule that we consider more appropriate for deciding whether James River violated the indenture.
In Shenandoah, using the "source of funds" rule, the court illustrated the potential sweep of the language condemning direct or indirect use of unqualified funds to redeem by hypothesizing that an issuer might buy an asset with lower-rate borrowed money and sell the asset to generate "qualified" funds for a redemption. Shenandoah, 14 Del. J. Corp. L. at 409. Under such a scenario, the actual source of the funds would not be the asset but the borrowed money that was used to acquire the asset that was then liquidated to cash. We hold that the refunding limitation, couched in terms that prohibit direct and indirect activity in whole or in part, should be applied with focus on the funds used for the redemption rather than on the entire transaction involving the successful tender for some bonds and redemption of other bonds. James River did not use lower-rate borrowed money to pay for the redeemed bonds. James River complied with the restrictions in the contract regarding the redemption of the bonds. A broader interpretation of the transaction would effectively rewrite the contract to give the investors more than they bargained for in an arm's-length transaction between sophisticated parties. The trial judge correctly entered the summary judgment for the defendants on the breach-of-contract claim.

The Tort Claims
The investors also alleged conversion, the tort of bad faith, and fraud. The trial court dismissed these claims, under Ala. R. Civ. P. 12(b)(6), for failure to state a claim. "The appropriate standard of review under Rule 12(b)(6) is whether, when the allegations of the complaint are viewed most *1179 strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle her to relief." Nance v. Matthews, 622 So.2d 297, 299 (Ala. 1993).
The trial court dismissed the conversion claim because it concluded that James River did not wrongfully take any property of the investors. "To have a conversion claim, there must be (1) a wrongful taking, (2) an illegal assumption of ownership, (3) an illegal use or misuse of another's property, or (4) a wrongful detention or interference with another's property." Gillis v. Benefit Trust Life Ins. Co., 601 So.2d 951, 952 (Ala.1992). The trial judge correctly stated:
"The plaintiffs' allegations reflect that they surrendered their 1988 Debentures in exchange for payment of either the tender price offered by James River or the contractually scheduled redemption price. Either way, they received value for turning their debentures over to the defendants."
We agree. The trial court properly dismissed the conversion claim.
The investors also argue that the defendants breached an implied covenant of good faith and fair dealing. Thus, they argue that the defendants acted in bad faith by retiring the bonds in the manner that they did. The trial judge correctly dismissed the bad faith claim, stating: "The tort of bad faith is recognized in this state only in the context of insurance policies. No insurance policy is involved in this case. While an obligation of good faith and fair dealing is implied in all contracts, it is directive rather than remedial." Because no insurance policy is involved, we conclude that the trial court properly dismissed the bad-faith claim. See Aplin v. American Sec. Ins. Co., 568 So.2d 757 (Ala.1990).
The investors also claim that the defendants acted fraudulently by failing to disclose a variety of data regarding the financial condition of the company and the availability of qualified funds required for redemption of the bonds. The investors argue that this case presents a special situation where the defendants had "an affirmative duty to speak, and to disclose the concealed facts." The investors argue that they would have acted differently had they known the intentions of the defendants. The trial court dismissed the fraud claim because there was no showing that the defendants had a duty to disclose the information. "The elements of a suppression claim are 1) a duty to disclose the facts, 2) concealment or nondisclosure of material facts by the defendant, 3) inducement of the plaintiff to act, and 4) action by the plaintiff to his injury." Foremost Ins. Co. v. Parham, 693 So.2d 409, 423 (Ala.1997). The defendants were not bound to disclose the facts the investors claimed that they should have been told. The trial court correctly stated:
"No fiduciary or confidential relationship arose merely because the debenture holders effectively loaned money to James River in exchange for the 1988 Debentures. Moreover, even if a duty of disclosure existed, James River complied when it announced the tender offer to be followed by the call and redemption and then carried through exactly as disclosed. Except in conclusory non-factual terms, the Complaint sets forth no viable basis for liability on a fraud/deceit theory."
The investors' fraud claim is grounded on what James River did not say, not on what it did say. They argue that James River, with the complicity of Merrill Lynch, perpetrated a "bluff" that allowed James River to redeem the debentures that were not tendered, when it would not have been able to do so but for the bluff. The bluff, which we would characterize as a calculated economic decision based on Merrill Lynch's statistical analysis, was the act of proffering a tender, which conceivably could have resulted in James River's not receiving enough tendered bonds to allow it to proceed with the announced redemption. They say that James River concealed its "desperately short cash position," thereby lulling the debenture holders into accepting the tender. The investors want the power to refuse to tender and to force James River either to find more qualified funds or to cancel the announced call. We do not interpret the indenture to give the bondholders that kind of power over the *1180 financial decisions of the corporation. The claim is speculative at best, in that it assumes that James River could not have sold more preferred stock to accomplish the redemption if that had been necessary. We agree with the trial court that James River had no duty to disclose its cash status to the investors. Therefore, the investors have failed to prove a claim of suppression. We hold that the trial court properly dismissed that claim.

The Trust Indenture Act Claim
The plaintiffs appealed the ruling on the Trust Indenture Act claim, and they have made a brief argument as to that claim upon their application for rehearing. That Act protects the "right of any holder of any indenture security to receive payment of the... interest on such indenture security." Because we conclude that no bondholder's payment of interest was impaired by the actions of James River, we affirm James River's summary judgment as to the TIA claim.

The Tortious-Interference Claim Against Merrill Lynch
The investors claim that Merrill Lynch interfered with the contract between James River and the investors. They state that Merrill Lynch created the scheme to retire the bonds with lower-rate borrowed money. The trial court entered a summary judgment for Merrill Lynch on this tortious-interference claim because this claim was dependent on the success of the breach-of-contract claim. The trial judge determined that the tortious-interference claim failed because he held there had been no breach of contract. For a different reason, we agree with the trial court that Merrill Lynch did not tortiously interfere with the contract. An intentional-interference-with-business-relations claim requires:
"(1) The existence of a contract or business relation;
"(2) Defendant's knowledge of the contract or business relation;
"(3) Intentional interference by the defendant with the contract or business relation;
"(4) Absence of justification for the defendant's interference; and
"(5) Damage to the plaintiff as a result of defendant's interference."
Gross v. Lowder Realty Better Homes & Gardens, 494 So.2d 590, 597 (Ala.1986).
We conclude that Merrill Lynch's actions were justified because James River had employed that firm to assist with the retirement of the bonds. Thus, the investors did not satisfy the fourth element. Merrill Lynch did not tortiously interfere with the contract between James River and the investors. The trial court properly dismissed the tortious-interference claim.

Class Certification
The investors argue that the trial court improperly denied class certification for the tort claims. The court denied certification because the plaintiffs are from different states and, therefore, different state laws would govern any fraud claims. However, there is no need to analyze this issue, because of our conclusion that the trial court properly dismissed the tort claims. There would be no reason to certify a class on a claim that is not viable. Therefore, we do not address the merits of the investors' argument on this issue.

Conclusion
Because the tender offer was not subject to the restrictions set out in the redemption clause and because James River bought back the redeemed bonds with qualified funds, the defendants did not breach the contract with the investors. The trial court properly entered the summary judgment for the defendants on the breach-of-contract claim and for Merrill Lynch on the tortious-interference claim. The trial court also properly dismissed the tort claims. Therefore, the judgment of the trial court is affirmed.
OPINION OF APRIL 17, 1998, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
MADDOX, HOUSTON, SEE, and LYONS,[*] JJ., concur.
*1181 ALMON, SHORES, KENNEDY,[**] and COOK, JJ., dissent.
ALMON, Justice, dissenting.
The question here is whether the summary judgment was correctly entered on the investors' claims against James River and Merrill Lynch arising out of the simultaneous tender and call ("STAC") of James River's 10¾% debentures (sometimes referred to as bonds).[1] The indenture, pursuant to which the debentures were issued, prohibits redemption within the first 10 years (until October 1, 1998) with money borrowed at less than 10¾%. James River purchased about $200,000,000 of the debentures under the tender offer with money borrowed at 6¾% and redeemed less than $5,000,000 of the debentures with the proceeds of an issue of preferred stock. Of the total of $250,000,000 in debentures, James River purchased about $45,000,000 pursuant to the tender offer with other funds, which the plaintiffs allege were also the proceeds of low-cost debt. Thus, the holders of about $245,000,000 of the debentures responded to the tender offer. The plaintiffs contend that James River breached the indenture, and that James River and Merrill Lynch acted tortiously,[2] by using the $200,000,000 in funds borrowed at 6¾% toward the retirement of the bonds.
The circuit court held there was no breach of the indenture and, therefore, no tortious conduct, because James River used only qualified fundsthe proceeds of the sale of preferred stocktoward the redemption. The circuit court's order construes the complaint as confusing the tender offer with the redemption and as taking the position that the indenture prohibits James River from making a tender offer with low-cost borrowed funds. This is not the plaintiffs' position. Under the plaintiffs' construction, the indenture would allow a tender offer with low-cost borrowed funds, so long as the threat of a follow-up redemption did not coerce acceptance of the tender offer at an artificially lowered price. In short, it is the very coordination of the tender offer with the redemption, the simultaneous aspect of the STAC, that violates the debenture.
Here are the figures that demonstrate the plaintiffs' theory. The indenture allows redemption with qualified funds (e.g., retained earnings or proceeds of a sale of stock) in fiscal 1992 at a price of 108.60% of the principal amount of the indentures, plus accrued interest. On September 18, 1992, Merrill Lynch published notice of the STAC, making a tender offer at $1093.75 per $1,000 of principal of the bonds, plus accrued interest. The STAC letter stated that James River "currently intends to redeem Bonds not purchased pursuant to the offer as provided in the Indenture." The letter later notes that the indenture provides for redemption between October 1, 1992, and September 30, 1993, "at 108.60% of their principal amount, and at prices decreasing annually thereafter to 100% of their principal amount on or after October 1, 2008." In short, the letter said, "Either tender at $1093.75 per $1,000 or we will redeem at $1086.00 (or less) per $1,000."
Absent the threat of the redemption, the tender offer would have to be made at or near the market value of the debentures. The plaintiffs provided evidence that Merrill Lynch calculated a value of the bonds in June 1992, assuming they could remain outstanding until 1998, at $1146.16 per $1,000, and, in July 1992, calculated a value of $1210.20 per $1,000. Thus, the tender offer was more than $50 less than the June calculation and more than $116 less than the July calculation of market value per $1,000 in principal amount.
Nevertheless, because the tender offer was backed by the threat of a redemption, at an even lower price, to conclude the retirement of the bonds, the bondholders could not afford to ignore the tender offer. The activity that the plaintiffs refer to as tortious is the *1182 concealment of the fact that, at the time of the STAC, James River had only $3,000,000 in qualified funds on hand and could not raise more than $100,000,000 from the sale of preferred stock. In fact, from that sale, $80,000,000 was used to retire other high-cost debt that similarly required the use of qualified funds. Therefore, the plaintiffs presented evidence that James River had a maximum of only $23,000,000 available for the threatened redemption. If the bondholders had known this, they say, they would not have tendered at what they considered an unfairly low price of $1,093.75.
The indenture prohibits redemption in the first 10 years
"directly or indirectly, in whole or in part, from or in anticipation of the proceeds (or any part of the proceeds) of any moneys borrowed by or for the account of the Company which have an effective interest cost to the Company (calculated in accordance with generally accepted financial practice) of less than 10.75% per annum."
(Emphasis added.) This is termed a "non-refund" provision, because the extinguishment of debt with other debt is a "refunding" of the debt.
The parties and the circuit court have treated three cases as being the most dispositive cases, most closely on point: Franklin Life Ins. Co. v. Commonwealth Edison Co., 451 F.Supp. 602 (S.D.Ill.1978), aff'd, 598 F.2d 1109 (7th Cir.), cert. denied, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979); Morgan Stanley & Co. v. Archer Daniels Midland Co., 570 F.Supp. 1529 (S.D.N.Y.1983); and Shenandoah Life Ins. Co. v. Valero Energy Corp., (No. 9032, June 21, 1988) 14 Del.J.Corp.L. 396 (Del. Ch.1988) (not published in Atlantic Reporter).[3] These three cases were published before these indentures were issued in October 1988; James River and Merrill Lynch argue that they provided notice that the non-refund provision would not prevent a STAC. However, I do not find them to support the circuit court's judgment. I note the following two points as the principal distinguishing features: (1) None of these three cases involved a STAC; in all three cases, all of the securities or bonds were redeemed. (2) In each case, the redeeming issuer had enough qualified funds available to effect the entire redemption. The investors' argument was that incurring substantial low-cost debt contemporaneously with the redemption violated the non-refund provision. The court in each case held that, because the issuer was careful to segregate the qualified funds and to use only qualified funds for the redemption, the fact that the issuer was also engaging in low-cost borrowing at the same time would not establish an indirect use of the low-cost debt to refund the bonds (or, in Franklin Life, 10¾% preferred stock that was subject to a non-refund provision). This is called the "source rule" because the court looks only at the source of the funds actually used for the redemption, not at the redeeming issuer's overall debt and capital structure.
Those three cases can easily be distinguished. In each of them, the issuer of the bonds had sufficient qualified funds on hand to retire the entire nonrefundable bond issue, so the redemption using those funds did not violate the non-refund provision. Here, James River could not retire the entire principal amount of the 10¾% bonds with qualified funds, and it concealed that fact from its investors when making the STAC. By retiring 98% of the bonds through 6¾% debt proceeds and other nonqualified funds, James River was able to reduce the amount of outstanding bonds to an amount that it could redeem with qualified funds. This, say the plaintiffs, amounts to an indirect use of the 6¾% debt to effect a redemption, in violation of the non-refund provision.
I agree with the plaintiff investors that a fact question is presented on these issues. I would hold that the summary judgment was inappropriate on the contract count. I think *1183 some of the tort counts could probably also present fact questions, but in view of the majority's holding it is not necessary for me to address those counts.
For the foregoing reasons, I dissent.
SHORES, KENNEDY, and COOK, JJ., concur.
NOTES
[*] Justice Lyons was not a member of this Court when this case was orally argued; however, he has listened to the tape of the oral argument.
[**] Although Justice Kennedy was not present at oral argument, he has reviewed the videotape of the oral argument.
[1] Three of the plaintiffs' claimsfraud, conversion, and bad faithwere actually dismissed, but I will not discuss those claims separately in this dissent.
[2] The complaint also included a count alleging that the defendants had violated the Trust Indenture Act, 15 U.S.C. § 77ppp(b).
[3] Mann v. Oppenheimer & Co., 517 A.2d 1056 (Del.1986), is factually similar to this case in some respects. In that case, Oppenheimer did not follow through with a redemption, and the question was whether it had fraudulently threatened to follow the tender offer with a redemption without truly intending to redeem the bonds not tendered. The Supreme Court of Delaware reversed a summary judgment for Oppenheimer, holding that a fact question was presented on the fraud claim. The result in Mann does not support the summary judgment here.