# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CRAIG BRECHNER,

        Plaintiff,

    v.

PHOENIX NETWORK
SOLUTIONS LLC, a Delaware
limited liability company, and
PHOENIX TELECOM NC, LLC,
a North Carolina limited liability
company,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. N16C-12-058 CEB

Submitted: August 17, 2017
Decided: December 1, 2017

**MEMORANDUM OPINION**
*Upon Consideration of*
*Defendants' Motion for Summary Judgment.*
**DENIED.**

Neil R. Lapinski, Esquire, GORDON FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware. Attorney for Plaintiff.

Richard M. Beck, Esquire and Sean M. Brennecke, Esquire, KLEHR HARRISON HARVEY BRANZBURG, LLP, Wilmington, Delaware. Attorneys for Defendants Phoenix Network Solutions LLC and Phoenix Telecom NC, LLC.

**BUTLER, J.**

## INTRODUCTION

The Court has before it a Motion for Summary Judgment filed by the Defendants. For the reasons set forth below, Defendants' Motion is **DENIED**.

## FACTUAL BACKGROUND

As this controversy is somewhat convoluted, we will begin by introducing the parties, such as we know them at this early stage of the litigation.

### A. The Parties

Plaintiff Craig Brechner ("Brechner") is the founder of Defendant Phoenix Telecom NC, LLC, ("Telecom"). He undertook a sale of the company for which he received consideration that included a Subordinated Note payable by the buyers to him. This Subordinated Note and accompanying Subordination Agreement figure heavily into this dispute.

Defendant Phoenix Network Solutions, LLC ("Network") is the entity that purchased Telecom from Brechner. Counsel has characterized Network as a group of "private equity" investors formed for the purpose of purchasing Telecom from Brechner. Counsel were unclear, but believe that Brechner also became a member of Network as part of the purchase and sale consideration.

The only other entity of note in this dispute is Scout Partners II LLC ("Scout Partners II"). While the papers before the Court describe this group only as "agent

1

for the lenders," counsel have advised that this entity is made up of some or all of the investors in Network.

## B. The Documents

When Telecom was sold to Network, there were two sets of loan documents that matter to this dispute. There was a "Term Loan and Security Agreement" ("Credit Agreement") that secured the loan made by "Lenders" to Network and Telecom with Scout Partners II acting as "a Lender and as Agent." We have been told this loan was in the principal amount of $6 million and was intended to provide working capital for the business. For want of a better description, we can call this the senior debt.[1]

The second set of documents secured a loan by Brechner to Network and Telecom. While not terribly important, we understand this loan was the method by which the parties agreed to pay Brechner at least part of the consideration for the sale of Telecom. Thus, in this sense Brechner became a "lender" to Network and Telecom. The papers supporting this "loan" were 1) a Subordination Agreement and 2) a Subordinated Note. These documents were intended to set out the rights and responsibilities of Network and Telecom to make periodic payments to Brechner in

---

[1] While the Credit Agreement labels "THE LENDERS THAT ARE SIGNATORIES HERETO" as the "Lenders" and Scout Partners II as "a Lender and as Agent," Scout Partners II is the only signatory lender. Moreover, the Credit Agreement's final page identifies one lender, Scout Partners II, and lists the loan amount as $6 million.

2

the principal amount of $1.8 million. Scout Partners II was to act as "agent" for the Brechner loan. Thus, Scout Partners II was the lender and agent for the senior debt of $6 million in working capital and also agent for the Brechner loan.

It is undisputed that the Subordinated Note payable to Brechner was subordinated to the loan obligations under the Credit Agreement and payable to Scout Partners II as lender and agent on the senior debt.

### C. The Subordinated Loan Terms

The terms of the Subordination Agreement and the Subordinated Note payable to Brechner lie at the heart of the dispute. First among these terms is the Subordinated Note's boldfaced preamble setting forth that the Subordinated Note payable to Brechner was subordinated to the senior debt. Second, the Subordination Agreement provides that "no payments of any kind, including regularly scheduled interest payments, shall be paid during the continuance of an Event of Default . . . ."[2]

The Subordination Agreement does not define what constitutes an "Event of Default." Rather, that term is defined in the Subordinated Note. The Subordinated Note defines an "Event of Default" to include, among other things, "failure of the Borrowers to make any payment of . . . (B) interest on this [Subordinated] Note for

---

[2] Subordination Agreement § 1(c).

3

four consecutive fiscal quarters . . . ."[3] Brechner's claim is that the borrowers—Network and Telecom—have not made interest payments on the Subordinated Note for four consecutive fiscal quarters.[4] Defendants do not dispute that they have not done so.[5]

Section 3.4 of the Subordinated Note sets forth what happens when the Subordinated Note goes into default for want of the periodic interest payments. Section 3.4 states that when this happens, "so long as the Senior Indebtedness has been Paid in Full," Brechner may accelerate the maturity of the Subordinated Note and demand full payment "provided, however," that if the Senior Indebtedness has not been Paid in Full (spoiler alert: it has not), then Brechner is prohibited from accelerating the Subordinated Note or bringing suit for any payment whatsoever and "provided, further," that if there is an Event of Default under the senior loan/Credit Agreement (spoiler alert: there is), then the provision prohibiting Brechner from accelerating the Subordinated Note or bringing suit shall only apply if Scout Partners II, acting as the Agent, undertakes "commercially reasonable steps to protect its rights and the rights of the Lenders (as defined in the Credit Agreement) with respect

---

[3] Note § 3.1.

[4] Compl. ¶¶ 10-11.

[5] At oral argument, defense counsel raised the issue of whether Brechner called the default too soon as four quarters had not yet elapsed. This is not Defendants' primary argument however, as four quarters have concededly elapsed now, and Defendants do not seek summary judgment on this basis.

4

to such Event of Default . . . ."[6] The Subordinated Note is exacting in this regard: "In determining whether the Agent's actions are commercially reasonable in the foregoing sentence, the Agent's actions shall be compared to the commercially reasonable steps an unrelated third-party lender would take with respect to such Event of Default."[7]

Defendants take the position that these latter provisions are inapplicable here. They point to the fact that the Subordination Agreement provides that "no payments of any kind, including regularly scheduled interest payments, shall be paid [to Brechner] during the continuance of an Event of Default . . . ."[8] Since by the terms of the Subordination Agreement, it controls the terms of the Subordinated Note in the event there is any disagreement in the terms, Defendants argue that the Subordination Agreement's provision that no payments can be made to Brechner while the senior debt is in default effectively ends any inquiry into if the Subordinated Note is in default and Defendants are entitled to summary judgment, dismissing this suit.

---

[6] Note § 3.4.

[7] *Id.*

[8] Subordination Agreement § 1(c).

## STANDARD OF REVIEW

The Court may grant summary judgment only where the moving party can "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[9] The moving party has the initial burden of showing that no material issues of fact exist, and when that is met, the burden shifts to the non-moving party to show that a material issue of fact does exist.[10] On a motion for summary judgment, the Court views all facts in a light most favorable to the non-moving party.[11] If a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law, summary judgment is inappropriate.[12]

## ANALYSIS

At the outset, we would do well to consider the meager state of the record before us. The instant motion might be a motion to dismiss the complaint but for the addition of a couple of affidavits vouching for the authenticity of the loan

---

[9] Super. Ct. Civ. R. 56.

[10] *Moore v. Sizemore*, 405 A.2d 679, 680-81 (Del. 1979).

[11] *See Matas v. Green*, 171 A.2d 916, 918 (Del. Super. 1961).

[12] *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962).

6

documents.[13] Depositions and other discovery have not been taken. Indeed, some of the Court's understanding is based upon representations by Delaware attorneys who were not present for these negotiations and were subsequently tasked with filling in the blanks in a record that has not been fleshed out. That alone gives the Court pause in granting what is essentially a dismissal of the Complaint.[14]

In the Court's view, the stumbling block for Defendants lies in section 3.4 of the Subordinated Note and its rather detailed default provisions. The parties remind the Court that it must give breath to all of the provisions of the agreements: 1) Defendants to section 1(c) of the Subordination Agreement that essentially prohibits payments to Brechner while the senior debt is in default and 2) Plaintiff to section 3.4 of the Subordinated Note that details the "commercially reasonable" steps the Agent must take when the senior debt is in default.

Because there has been no trial and no substantial discovery, the Court is not in a position to call itself an expert on these facts. But it seems that if it is true that

---

[13] When a defendant moves to dismiss pursuant to Rule 12(b)(6) and submits affidavits in addition to the pleadings, the motion is converted to—and considered by the Court as—a motion for summary judgment. *Gutheim v. Viacom, Inc.*, 2000 WL 1211511, at *2 (Del. Super. June 30, 2000), *aff'd*, 765 A.2d 951 (Del. 2000).

[14] *See Motorola, Inc. v. Amkor Tech., Inc.*, 849 A.2d 931, 935 (Del. 2004) ("If material issues of fact exist or if a court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate."). It is true that had Plaintiff chosen to, he might have defended the instant Summary Judgment Motion by seeking leave to take further discovery under Rule 56(f). And in fairness to the defense, there is not much divergence in the factual recitations of the two parties. But the Court believes what divergence there is matters to the outcome.

the investors in Network, the senior lenders under the Credit Agreement, and the Agent for the Lenders—Scout Partners II—are all related somehow (a contention that local counsel could not deny but were hesitant to confirm), then Brechner's attorneys would have been well served to ensure that section 3.4 of the Subordinated Note was included. This is so because otherwise the Borrowers—Network and Telecom—could simply fail or refuse to make payments to the senior lender with whom it was affiliated, thereby putting and keeping the senior debt in default and effectively precluding Brechner from ever receiving payment under his Subordinated Note. If that were all so, Brechner's attorneys would certainly seek the language to be found in section 3.4, obligating the Lenders' Agent to exercise commercially reasonable efforts to cure the default in the senior debt.

If the Court were to agree that on the face of the Subordination Agreement the Defendants have no duty to make payments to Brechner because there is a default ongoing in the senior debt, then the language in the default provision concerning the commercially reasonable activity of the Agent when the senior debt is in default is rendered meaningless. The Court is struck by the language in the default provision that the Agent's efforts to cure a default in the senior debt should be "compared to the commercially reasonable steps an unrelated third-party lender would take with respect to such Event of Default." This suggests that Brechner's attorneys were

8

indeed concerned that Brechner would otherwise be unfairly frozen out of his right to payment.

The Court does not here intend to favor the default language of the Subordinated Note over the language of the Subordination Agreement. Defense counsel made a strong argument that the requirement that the senior debt not be in default before any payments could be made on the subordinated debt sets up a condition precedent to payment under the subordinated debt and therefore, there can be no default under the subordinated debt. While the Court agrees that the argument has some appeal, it is difficult to square with the quite exacting provisions concerning defaults and the Agent's duties in the Subordinated Note.

Summary judgment is available to the defense only if the evidence presented, viewed in the light most favorable to Plaintiff, the non-moving party, shows that Defendants are entitled to judgment as a matter of law.[15] There is no "right" to summary judgment.[16] Rather, it should be granted only if the trial court is convinced that there is no triable issue.[17] The Court is not satisfied that there is no route to recovery for Plaintiff and therefore cannot grant Defendants' request for summary

---

[15] *See Mann v. Oppenheimer & Co.*, 517 A.2d 1056, 1060 (Del. 1986).

[16] *Cross v. Hair*, 258 A.2d 277, 278 (Del. 1969).

[17] *Id.*

judgment.[18]

## **CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment

is **DENIED**.

**IT IS SO ORDERED.**

_____
Judge Charles E. Butler

---

[18] If there is any reasonable hypothesis by which the non-moving party may recover, the motion for summary judgment must be denied. _Vanaman v. Milford Mem'l Hosp., Inc._, 272 A.2d 718, 720 (Del. 1970).