# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DALE YEILDING and SANDRA YEILDING, husband and wife, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No.: 2019-0826-SG |
| COUNCIL OF ASSOCIATION OF UNIT OWNERS OF PELICAN COVE CONDOMINIUM, | ) ) ) ) | |
| and CATHERINE ROBINSON, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  January 21, 2022
Date Decided:  April 20, 2022

Dean A. Campbell, of LAW OFFICE OF DEAN A. CAMPBELL, P.A., Milton, Delaware, *Attorney for Plaintiffs Dale Yeilding and Sandra Yeilding.*

Richard E. Berl, Jr., of HUDSON, JONES, JAYWORK & FISHER, LLC, Lewes, Delaware, *Attorney for Defendants Council of Association of Unit Owners of Pelican Cove Condominium and Catherine Robinson.*

**GLASSCOCK, Vice Chancellor**

This Court developed as a tool with which to administer equity—fairness—in cases where courts of law were unable to act.[1] To that end, it may employ injunctive relief, but only where justice so requires. The equities in this case, I find after trial, are insufficient to such relief.

The Plaintiffs here are unit owners in a condominium in Dewey Beach, a former bayfront hotel with a marina known as Pelican Cove. Dale and Sandra Yeilding, the Plaintiffs,[2] are a married couple who rent out their unit in the condominium as a vacation unit, and make personal use of it, as well. The Yeildings previously were defendants in a matter brought by the unit holder association (the "HOA"), which successfully advocated that the Yeildings were bound to a maximum number of rental tenants—six—as provided in the Pelican Cove Condominium Declaration (the "Declaration") despite having the largest unit in the condominium.[3] After that suit was resolved in favor of the Pelican Cove HOA, the Plaintiffs brought this action against the HOA and one other unit holder, Catherine Robinson, individually (the HOA and Robinson together, the "Defendants"). The Plaintiffs posit a flurry of causes, all generally based on the allegation that various actions of

---

[1] *See, e.g.*, William T. Quillen & Michael Hanrahan, *A Short History of the Delaware Court of Chancery*, 18 Del. J. Corp. L. 819 (1993).

[2] I alternate between references to "the Plaintiffs" and "Yeilding" in this Memorandum Opinion as, although Sandra Yeilding is named as a plaintiff, only Dale Yeilding testified at trial, and the Plaintiffs' briefing also refers to Mr. Yeilding in the singular in many instances.

[3] *Council of Ass'n of Unit Owners of Pelican Cove Condo. v. Yeilding*, 2020 WL 2465725 (Del. Ch. May 13, 2020).

1

the HOA were *ultra vires* and incompatible with the Declaration, or with positive law. The action was expedited and the Plaintiffs sought relief via a temporary restraining order; nonetheless, the pace of the litigation has been desultory. Eventually, a trial seeking various applications of injunctive relief was held on November 16, 2021, and post-trial briefing followed. This is my post-trial Memorandum Opinion. I find that equity was not sufficiently invoked so that any injunctive relief is appropriate. I also find that the Plaintiffs' allegations wander the borderlands that separate merely weak claims from the country of the frivolous. My reasoning follows.

## I. BACKGROUND[4]

At bottom, this case revolves around the Plaintiffs' disagreement with various recent decisions of the HOA. As identified above, the Plaintiffs, the Yeildings, are owners of Unit #7 at Pelican Cove. They bring this action against the HOA as well as individually against the owner of Unit #2, Catherine Robinson.

The Complaint outlines four disparate bases for receipt of injunctive relief. In brief, those bases are as follows: first, Unit #2 has been altered impermissibly under the Plaintiffs' reading of the Declaration; second, various unit owners have failed to

---

[4] The facts in this section are drawn primarily from the parties' pre-trial stipulation, joint exhibits or testimony given at trial, though it has occasionally been necessary to reference other papers such as the complaint in order to properly outline the lawsuit. Where the facts are drawn from exhibits jointly submitted at trial, they are referred to according to the numbers provided on the parties' joint exhibit list and with page numbers derived from the stamp on each JX page ("JX __, at ___").

comply at all times with the Declaration and a second governing document, the Pelican Cove Code of Regulations (the "Code of Regulations"), which (per the Plaintiffs) prohibit obstruction of the decks and/or balconies at Pelican Cove; third, the depth of the marina adjoining the property is insufficient under the latest amendment to the Declaration; and fourth, the HOA has drafted common area rules purporting to regulate renters' guests, which, per the Plaintiffs, violate the Declaration.[5] I consider the governing documents in more detail below, along with a brief background of the facts alleged with respect to each particular count of the second amended complaint (the "Complaint").[6]

### 1. The Pertinent Documents

The Declaration "create[s] a plan of condominium ownership" in the subject property, and was originally recorded in 1978.[7] Since that time, the Declaration has undergone three amendments, with the latest occurring in 2008.[8] The amendment process requires a two-thirds vote of the membership.[9] Property owners at Pelican Cove are entitled to a voting percentage equal to the proportion of their unit's

---

[5] Fifth and sixth causes of action (regarding attorneys' fees) were originally pled. Second Am. Compl. for Injunctive Relief ¶¶ 73–83, Dkt. No. 25 [hereinafter "Compl."]. Count six, relating to special assessments, was withdrawn without prejudice at trial. *See* Tr. of 11.16.21 Trial, 87:21–23, Dkt. No. 40 [hereinafter "Trial Tr."]; *see also* Compl. ¶¶ 76–83. Count five, relating to "shifting of attorneys fees," has not been prosecuted and will not be considered here. *See* Compl. ¶¶ 73–75.
[6] *See* Compl.
[7] JX 1, at Yeilding/Myers000352.
[8] JX 2, JX 3, JX 4.
[9] JX 1, at Yeilding/Myers000364.

footprint to that of the entire property.[10]  On that basis, the Plaintiffs are entitled to a vote, individually, greater than one-third; thirty-four percent.[11]  I refer to the Declaration and/or any of its amendments throughout this Memorandum Opinion as "the Declaration."

The Declaration, in accordance with Delaware statute, includes a "declaration plan" "show[ing]" the units and common elements on the property (the "Declaration Plan").[12]  The Declaration Plan is recorded.[13]

Pelican Cove unit owners adopted a Code of Regulations in 1978.[14]  A recent HOA meeting in 2020 purported to amend the Code of Regulations, though the Plaintiffs dispute whether this amendment was valid.[15]  A recorded copy of the amendment was provided as joint exhibit 23.[16]  The Code of Regulations, by its terms, can be amended by "vote of majority of the owners at any regular or special meeting."[17]  I refer to the Code of Regulations and any of its amendments throughout this Memorandum Opinion as the "Code of Regulations."

---

[10] *See* Pre-Trial Stipulation and Order, II ¶ 4, Dkt. No. 36 [hereinafter "Stip."]; *see also* JX 1, at Yeilding/Myers000369.
[11] *See* Stip. at II ¶ 2.
[12] *See* 25 *Del. C.* § 2219(4); *see also* JX 6.
[13] *See* JX 6.
[14] JX 5.
[15] *See* JX 21; Stip. at I ¶ 3 ("The modification placed the Code of Regulations in conflict with the Declaration, where when such conflict exists, the Declaration governs.").
[16] JX 23.
[17] JX 5, at Yeilding/Myers000382.

Where any conflict exists between the Declaration and the Code of Regulations, the conflict shall, "if not otherwise reconciliable [sic], be resolved in favor of the Declaration."[18]

The Pelican Cove Beach House Rental Rules (the "Rental Rules") are a third pertinent document.[19] These rules do not appear to be formally recorded and are aimed at regulating the behavior of rental guests.[20] The document lays out eight Rental Rules, which appear to be primarily focused on regulating behavior affecting common areas or common elements of the condominium, such as parking and plumbing.[21] A somewhat abbreviated version of these rules is posted at the entrance to the common areas of Pelican Cove.[22]

The Plaintiffs particularly take issue with rule number three ("Rule 3"), which states: "No parties or large social gatherings. People other than those in the rental party are not allowed on the property. No visitors are allowed."[23]

---

[18] JX 1, at Yeilding/Myers000365.
[19] JX 22.
[20] *Id.*
[21] *Id.*
[22] Trial Tr. 45:12–22.
[23] *See* JX 22; *see also* Trial Tr. 45:8–47:15.

The Plaintiffs allege that these rules were passed in violation of the Declaration.[24]  They also allege that the Rental Rules violate the Delaware Unit Property Act (the "Unit Property Act").[25]

### 2. The Allegations

#### a. Unit Alterations

In 2019, Robinson, the owner of Unit #2, sought to make certain renovations to her unit.[26]

The Declaration Plan shows the layout of Unit #2 (and all other units) in a considerable amount of detail, including the dimensions of the "LR" (which I assume means living room), the "BR" (which I assume means bedroom), and identifying kitchen and bathroom elements via symbols.[27]  The Declaration Plan only shows one bedroom in connection with Unit #2.[28]

The Declaration includes a description of the Pelican Cove building, noting: "Unit Number 2 is located on the first floor and consists of the following: a kitchen and dining area, a living room, a bedroom, a bathroom, a closet containing a laundry and three other closets."[29]  The Plaintiffs assert that this subsection of the

---

[24] Stip. at I ¶ 4.
[25] Pls. Opening Br. for Post-Trial Closing Args. 11, Dkt. No. 41 [hereinafter "Post-Tr. OB"]; *see also, e.g.*, 25 *Del. C.* § 2205.
[26] Trial Tr. 111:11–112:9; *see also* Compl. ¶ 19 (identifying the pertinent timeframe).
[27] *See* JX 6.
[28] *Id.*
[29] JX 4, at Yeilding/Myers000410.

Declaration, entitled "Description of Building," is a "required and mandated section of the Declaration pursuant to" Delaware statute.[30] The referenced statutory provision provides that a unit property's declaration must contain "[a] description of the land and building."[31]

The Declaration includes a broad definition of common elements, including, but not limited to,

> [t]he foundation, the pilings, all supporting posts and beams, and the crossbeams located under the building. The electrical wiring system, including transformers and all other equipment used to distribute the electricity, but not including any fixture inside or on the exterior of any wall within any of the individual units . . . . The outside exterior walls of the building except for the windowglass and screens. The plumbing facilities installed for use outside the various individual units . . . . [and t]he party walls located between the various units.[32]

Per Robinson's testimony at trial, which I found to be credible, she hired an architectural firm and a local contractor to accomplish interior-only changes to her unit.[33] Robinson testified that she "at one point had thought about" changing windows, which would have constituted an exterior renovation; as such, she brought her renovation plans to the HOA for approval.[34] Ultimately, however, Robinson testified that her changes did not affect the building's foundation; that each unit is

---

[30] *See* JX 1, at Yeilding/Myers000356; *see also* Compl. ¶ 14.
[31] *See* 25 *Del. C.* § 2219(2).
[32] JX 1, at Yeilding/Myers000357.
[33] Trial Tr. 112:24–114:1; 115:8–20.
[34] *Id.* at 115:11–20.

separately wired and each unit is separately metered with respect to water and sewage, and neither of these common elements were affected; that no exterior walls or windows were altered; that no party walls were altered; that no walls *inside* the unit were moved; and that she "only added" a wall.[35]

Robinson testified that once her daughter arrived, she and her partner "wanted to have an additional place where we could have another bed."[36] But, she noted, the original plans changed.[37] On cross-examination, Robinson clarified that, despite her desire to have room for an additional bed, post-renovations Unit #2 contains "an enlarged bedroom that has an adjoining office, but . . . they're not separate rooms."[38] She also noted that the bathroom was moved in connection with the remodel, and responded affirmatively when asked whether "the kitchen was relocated to some degree," including the kitchen sink.[39]

As noted, Robinson had taken her renovation plans to the HOA for approval.[40] The only evidence I have on the pertinent deliberations is Dale Yeilding's trial testimony, wherein he noted that the HOA allowed Robinson to proceed over his

---

[35] *Id.* at 116:7–118:14.
[36] *Id.* at 112:7–9.
[37] *Id.* at 112:21–113:10.
[38] *Id.* at 123:24–124:4.
[39] *See id.* at 124:13–125:4.
[40] *See id.* at 115:14–17.

objections.[41]    Exactly what the HOA considered itself to have approved, or permitted, is therefore not known to me.

Of note, Yeilding testified that failures in prior changes or repairs at Pelican Cove had previously required him to pay 34% of the ultimate fix (based on the size of his unit in proportion to the whole).[42]  He cited this as a reason that he objected to the renovations in Unit #2.[43]

### b. Balcony Obstructions

The Plaintiffs' second concern stems from what they view as inappropriate use of a common element of Pelican Cove: the decks or balconies.[44]  Section 14 of the Declaration discusses restrictions on use of common elements, clarifying that

> [u]se of all common elements shall in general be subject to such reasonable rules and regulations as may be from time to time adopted and amended . . . .  Without the prior written authorization of the council, no common element shall be obstructed . . . .  Furthermore, no towels, blankets, clothing, or other material of any kind shall be hung or draped or allowed to remain at or on any of the balconies, railings, porches, patios, docks, or catwalks of the property.[45]

---

[41] *See id.* at 22:3–18.  Yeilding declined to state that the HOA "approved" the renovation, because amendments to the Declaration require a two-thirds vote, and his abstention counts for 34% of the vote. *See id.*; *see also* JX 1, at Yeilding/Myers000369.

[42] Trial Tr. 26:23–27:10.

[43] *Id.* at 26:6–27:19.

[44] *See* JX 1, at Yeilding/Myers000358 (identifying the "outside steps and decking and any handrail leading to the entrance ways" as a common element).

[45] *See id.* at Yeilding/Myers000360–61.

The Code of Regulations also addresses use of common elements, specifying that a unit owner "shall not place . . . in any common element area any furniture, packages, or objects of any kind unless prior written consent from the Council is provided to the unit owner. Such areas shall be used for no other purpose than for normal transit unless otherwise approved by the Council."[46]

The President of the HOA signed a writing dated May 2020 and addressed to "Pelican Cove Owners" that permits the owners of units #4, #5, and #6 to locate chairs, tables, and other small objects on the balcony "in a manner that does not unreasonably restrict" passage.[47]

The Plaintiffs alleged in their Complaint that certain furniture and personal articles placed upon the deck are in violation of "Fire Safety Codes."[48] They also point to a purported conflict between the Declaration and the Code of Regulations,[49] questioning whether the "prior written" authorization or consent of the HOA requires a majority vote or a two-thirds vote.[50]

---

[46] JX 23.
[47] JX 21.
[48] Compl. ¶ 59.
[49] Post-Tr. OB 6.
[50] Id. at 7.

The Plaintiffs submitted joint exhibit 14, photographs of the deck in question, including the challenged deck chairs and the space remaining for ingress and egress.[51] The third photograph also shows the deck chairs in use.[52]

### c. The Pelican Cove Marina

Pelican Cove is situated next to a marina and provides its unit owners with access to the marina.[53] The Declaration identifies that the pier "has 7 boat slips that make up the marina . . . . Each unit is entitled to one navigable boat slip," and specifies that "[t]he right of each unit to a navigable boat slip is *guaranteed* by this agreement."[54]

---

[51] JX 14.

[52] That is, a photograph of residents sitting outside their units, presumably enjoying the bay views. *Id.* The Plaintiffs submitted a "Supplement to Closing Argument" shortly following their opening post-trial brief. Pls. Suppl. to Closing Arg., Dkt. No. 42. The supplement identifies the town of Dewey Beach (where Pelican Cove is located) as having adopted the "International Building Code" to regulate condominiums. *Id.* at 1. The post-trial reply brief specifies that the town of Dewey Beach adopted the International Building Code (the Dewey Beach Code also adopts future editions as promulgated) in its code of ordinances. Dewey Beach, Del., Code of Ordinances, ch. 71, § 1(A)(1) (2005); *see also* Pl.'s Reply Br. 12, Dkt. No. 48 [hereinafter "Post-Tr. RB"]. The supplement cites in particular a subsection on "Exit Passageways," identifying a minimum width of 36 inches for an exit passageway in certain circumstances and noting that "[t]he minimum width or required capacity of exit passageways shall be unobstructed." *Id.* at 2; *see* 2021 International Building Code, ch. 10, § 1024.2 (2021). Despite this, the Plaintiffs have not submitted any evidence that the exit passageways (the decks) are obstructed to a width of less than 36 inches. The only evidence that could demonstrate the width is JX 14, which I find insufficient to demonstrate clearance on the decks, as it does not attempt to show a violation of the 36-inch requirement. *See* JX 14. As the Defendants well note in their post-trial answering brief, the "Dewey Beach Code" issue was not included in the pre-trial stipulation, nor in the Complaint, and was only briefly raised without citation in Yeilding's testimony at trial. *See* Defs.' Post-Trial Answering Br. 24–25, Dkt. No. 43 [hereinafter "Post-Tr. AB"]; Stip.; Compl.; Trial Tr. 64:4–65:6. For these reasons, the supplement does not figure prominently in my treatment of the balcony obstructions.

[53] *See, e.g.*, JX 4, at Yeilding/Myers000411.

[54] *Id.* (emphasis added).

In order to provide the marina and navigable boat slips to its unit owners, the HOA entered into a subaqueous land lease with the Delaware Department of Natural Resources ("DNREC") in 2000.[55]  That lease, which had a twenty-year term, has since expired.[56]

The Plaintiffs' complaints about the marina are twofold in nature.  First, they argue that the lease renewal process, which is pending, was undertaken improperly.[57]  Second, they argue that the boat slips available are not "navigable" as defined in the Declaration.[58]

The Plaintiffs assert that the HOA Treasurer submitted an incomplete subaqueous lease application to DNREC without obtaining a "required two thirds (2/3) vote to renew the lease."[59]  The application is purportedly incomplete because no depth survey was submitted and because the marina, per the Plaintiffs, does not comply with the depth identified in the governing documents.[60]

For a slip to be "navigable" as defined in the Declaration, it must contain "18 inches of water at mean low tide."[61]  In the event a slip becomes non-navigable, the Declaration provides that the pertinent unit can notify the HOA in writing, and that

---

[55] Stip. at II ¶ 5.
[56] *See id.* at II ¶¶ 5–6.
[57] *See* Post-Tr. OB 8; *see also* Stip. at I ¶ 2a.
[58] *See* Post-Tr. OB 8, Stip. at I ¶ 2b.
[59] Stip. at I ¶ 2a.
[60] Compl. ¶ 47.
[61] JX 4, at Yeilding/Myers000411.

the HOA will then verify the condition of the slip and (presumably) take corrective action.[62]

The slips were not fully assigned when Yeilding first purchased Unit #7, and at that time another individual had been using slip 7.[63] As such, Yeilding agreed to use slip 5.[64] After this verbal agreement, Yeilding inquired about installing a boat lift on slip 5—a right not guaranteed in the pertinent documents[65]—but was purportedly unable to do so.[66] He has also used slips 1, 2, and 3 from time to time.[67]

Yeilding first notified the HOA on November 28, 2017[68] that he believed slip 1 was no longer navigable per the Declaration.[69] Per Yeilding's testimony, he measured the water depth in slip 1 himself and became concerned that the marina was insufficiently deep.[70] Once he informed the HOA of the non-navigability of slip 1, the HOA formally assigned him slip 5, and assigned slips 1, 2, and 3 to unit

---

[62] *Id.*

[63] *See, e.g.*, Trial Tr. 94:20–95:3 (the HOA President testifying as to the slips that were taken at the time Yeilding purchased Unit #7).

[64] *Id.* at 34:3–8.

[65] JX 4, Yeilding/Myers000411 (noting that a unit may make modifications to a slip, such as adding a boat lift, upon written approval of the Condominium).

[66] *See* Trial Tr. 33:10–35:24.

[67] *Id.* at 35:18–24.

[68] The joint exhibit, JX 9, is dated as of 2017. JX 9. I do note that the Plaintiffs' post-trial reply briefing indicates the letter was sent in 2019. *See* Post-Tr. RB 4. I have considered the exhibit the controlling authority as to the date, but note the discrepancy in case of any confusion.

[69] JX 9.

[70] Trial Tr. 36:6–22.

owners who did not own a boat.[71] Yeilding asserts he is unable to construct a boat lift in slip 5 due to a lack of available pylons and due to boat lift motors in slips 4 and 6 that extend "well into" slip 5,[72] but has not sought relief based on this contention, which, accordingly, I do not consider further.

Both the HOA and Yeilding proffered expert witnesses on the issue of marina depth.[73] Mr. Rob Plitko, Jr., a professional civil engineer, was the expert for the Plaintiffs.[74] Plitko specializes in hydrographic surveying, and has been working in this field since 2001.[75] Plitko measured the mean low water depth of the marina using a combination of GPS technology and data from the National Oceanic and Atmospheric Administration.[76] Following his measurements, Plitko produced a survey.[77] Plitko's survey was consistent with Yeilding's suspicions, showing that slips 1 and 2 had a depth of less than 18 inches at mean low tide.[78] Plitko's survey showed that slip 5 had sufficient depth.[79] Plitko also testified that it would be

---

[71] *Id.* at 37:9–38:2; JX 20 ("unit 2 requested slip 3[;] unit 5 requested 1[;] unit 4 requested 2"; the motion to grant the slips in question passed by a majority of owners, though Yeilding voted against).
[72] Trial Tr. 34:15–35:3.
[73] *See generally* Trial Tr.
[74] *See, e.g.*, Post-Tr. OB 9; JX 8.
[75] Post-Tr. OB 9; Trial Tr. 71:5–72:19.
[76] *See* Trial Tr. 73:9–75:21.
[77] JX 8.
[78] *Id.*
[79] *Id.*

possible to obtain different readings at different times of the year in the same places in the marina.[80]

The HOA's expert witness was Ms. Evelyn Maurmeyer.[81] Maurmeyer has worked with Delaware marina requirements for 40 years.[82] Maurmeyer was originally retained to prepare for a public hearing regarding Pelican Cove's renewal application.[83] Maurmeyer prepared a report in connection with that hearing using a "calibrated rod," which does not make use of GPS technology.[84] Per her report, which was adjusted to mean low water, each of the slips (including slips 1, 2, 3, *and* 5) had at least 2.3 feet of marina depth, with the outermost slips being about 3 feet deep.[85]

Despite the non-technological approach to measuring marina depths, Maurmeyer's report was adjusted for the mean low water level based on the "USGS Rehoboth Bay tide gage," which is made available online.[86] Maurmeyer testified that she had no way of confirming the USGS readings, but that she found it "highly unlikely that an agency like the USGS would have malfunctioning equipment."[87] Plitko testified that he did not agree with the tidal gage the USGS publicizes, stating

---

[80] Trial Tr. 83:15–19.
[81] *See generally* Trial Tr.
[82] *Id.* at 127:19–128:12.
[83] *Id.* at 129:1–11.
[84] *See* JX 18; *see also* Trial Tr. 137:21–138:11, 132:11–133:9.
[85] Trial Tr. 132:8–134:19; *see also* JX 18.
[86] Trial Tr. 138:12–22.
[87] *Id.* at 139:2–12.

that it reads "about six inches higher" than what his GPS provides.[88] Plitko has emailed and called the USGS to report this discrepancy, but he noted that it does not appear to have been corrected as of trial.[89]

Maurmeyer acknowledged that the figures she and Plitko had reached were different, and testified that she believed the figures differed due to the time of year in which their measurements occurred.[90] In support, she discussed the movement of the sand beneath the water, and the seasonality of sediment in a coastal environment.[91]

Maurmeyer was asked during her testimony to review the renewal application the HOA had submitted.[92] She looked at the exhibit in question, and testified that it "looked complete, and evidently DNREC deemed it complete. Otherwise, it would not have gone on public notice."[93] She also testified that the renewal process does not require a depth survey.[94]

---

[88] *Id.* at 141:14–24.
[89] *Id.* at 143:3–18. I note that this testimony was objected to after the line of questioning had already begun and after answers had been provided. *Id.* at 143:19–144:3. Once objected to, the line of questioning ceased. I consider the testimony prior to the objection in reviewing the totality of the facts.
[90] *Id.* at 135:1–5. Maurmeyer's survey occurred in August 2020. *See* JX 18. Plitko's survey occurred in March 2020. *See* JX 8.
[91] Trial Tr. 135:8–136:1.
[92] *Id.* at 131:5–24.
[93] *Id.*
[94] *Id.* at 132:1–4.

### d. Common Area Rental Rules

Finally, the Plaintiffs challenge the Rental Rules adopted by the HOA to control the Pelican Cove common areas. Particularly, they challenge Rule 3, which states: "No parties or large social gatherings. People other than those in the rental party are not allowed on the property. No visitors are allowed."[95] Their primary theory is that the Unit Property Act disallows this rule.[96] The Declaration also contains language very similar to that in the Unit Property Act regarding common elements, and the Plaintiffs say the Declaration has been violated as well.[97] The pertinent section of the Unit Property Act reads: "Each unit owner or lessee . . . may use the common elements in accordance with the purpose for which they are intended without hindering or encroaching upon the lawful rights of the other unit owners."[98]

The Plaintiffs point out that the rules in question are labeled "Rental Rules," meaning that owners can have parties or large social gatherings on the property, or guests on the property, but that renters cannot.[99] Their contention is that the quoted

---

[95] JX 22.

[96] Post-Tr. OB 11.

[97] *Id.* at 12; JX 1, at Yeilding/Myers000359. The Declaration, sensibly, notes that the HOA may adopt rules and regulations "provided they are not in conflict with the Unit Property Act," among other things. *See* JX 1, at Yeilding/Myers000355.

[98] 25 *Del. C.* § 2205.

[99] Post-Tr. OB 11.

language "[e]ach unit owner or lessee" from the Unit Property Act[100] prohibits discrimination between renters and owners.[101]

Robinson testified that the Rental Rules were enacted in response to certain disruptions that were preventing unit owners from enjoyment of the Pelican Cove property and common elements.[102] Particularly, she testified, the parking lot was being overrun with visitors, preventing unit owners from being able to park their cars, and "large, loud parties" were being held.[103] Additionally, rental guests went so far as to damage the neighboring property, the owner of which then filed complaints with the Pelican Cove HOA.[104] The Defendants' post-trial briefing clarifies that the issues with large visiting groups began "on the heels of the Yeildings' purchase of Unit 7."[105]

*B. Procedural History*

This case proceeded mostly straightforwardly, if slowly. The original complaint was filed in October 2019 along with a motion for Temporary Restraining Order.[106] The motion for Temporary Restraining Order was opposed in November 2019,[107] and the Temporary Restraining Order request was later withdrawn, with a

---

[100] 25 *Del. C.* § 2205.
[101] Post-Tr. OB 11.
[102] Trial Tr. 119:17–120:1.
[103] *Id.* at 120:19–121:3.
[104] *Id.* at 121:4–9.
[105] Post-Tr. AB 21.
[106] Compl. for Injunctive Relief, Dkt. No. 1; Mot. for TRO, Dkt. No. 1.
[107] Defs.' Resp. to Mot. for TRO, Dkt. No. 5.

new amended complaint filed.[108]   The complaint was subsequently amended a second time.[109]   The case then proceeded directly to trial without dispositive motion practice.[110]   Post-trial briefing followed, and I considered the matter submitted for decision as of the receipt of the post-trial reply brief in January 2022.[111]

## II. ANALYSIS

The Plaintiffs have alleged four different claims, and seek individual injunctive relief with respect to each.  Notably, the relief requested for each discrete allegation of wrongdoing differs significantly among the Plaintiffs' various papers.  The Pre-Trial Stipulation requests considerably more relief in connection with certain counts than was pled in the Complaint.[112]   The Complaint's pleading for relief also differs from that sought in the post-trial briefing, though not as significantly.[113]   To allow the pleadings to conform to the current state of affairs, so that the Plaintiffs have the benefit of the development of a full record at trial, I will treat the post-trial briefing as the operative requested relief.

---

[108] Letter to Sam Glasscock III from Dean A. Campbell, Esq. in Regards to the Motion for TRO and Motion to Amend Teleconference, Dkt. No. 8; Pls.' Mot. to Amend Compl., Dkt. No. 10; Am. Compl. for Injunctive Relief, Dkt. No. 13.
[109] Compl.
[110] *See* Trial Tr.  Certain motions in limine were filed prior to the trial; these were later withdrawn. *See* Defs.' Mot. in Lim. to Preclude Expert Test., Dkt. No. 28; Mot. in Lim. to Exclude the Test. of Defs. Proposed Expert Witness, Evelyn Maurmeyer, Dkt. No. 31.
[111] Post-Tr. OB; Post-Tr. AB; Post-Tr. RB.
[112] *See* Compl. ¶¶ 1–7; Stip. at IV ¶¶ 1–6.
[113] *See* Compl. ¶¶ 1–7; Post-Tr. OB 12–14.

The permanent injunction standard requires the plaintiff to demonstrate that: (1) it has proven actual success on the merits of the claims; (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm that will result if an injunction is not entered outweighs the harm that would result if an injunction is granted.[114] The equities must ultimately support the relief sought.[115]

Accordingly, I will assess the legal viability of each claim before turning to an analysis of whether injunctive relief should issue. I have treated each of the four complaints separately below. Before that, however, it is useful to address the allegations by the Plaintiffs that the Defendants have violated a dog's breakfast of statutes and regulations—including contentions raised at various stages of the litigation[116] that the Defendants have violated the Unit Property Act, the Dewey Beach Occupancy Code, Fire Safety Codes, and DNREC regulations. Further, per the Plaintiffs, these violations support declaratory judgment and equitable relief. Even assuming the predicate violations, this conclusion is unsupported. The Plaintiffs have failed even to attempt to show that they have a private right of action based on statutory or regulatory violations.

---

[114] *Christiana Town Ctr., LLC, v. New Castle Cty.*, 2003 WL 21314499, at *2 (Del. Ch. June 6, 2003), *aff'd*, 841 A.2d 307 (Del. 2004).

[115] *Cf. DeMarco v. Christina Care Health Servs., Inc.*, 263 A.3d 423, 434 (Del. Ch. 2021) (assessing as a final matter whether "the balance of the equities" tips for or against the requested injunction).

[116] *See, e.g.*, *supra* note 52; *infra* note 143.

I first note that the Plaintiffs have failed to cite any provision in any of these statutes and regulations providing explicitly that the General Assembly (or the entities to which it conferred regulatory authority) intended to provide a private right of action for any violation. The absence of an express statutory right of action does not necessarily bar any related cause of action, however.[117] Delaware caselaw has applied a three-prong test to assess whether a private right of action is available under a statute: asking first whether the plaintiff is a member of a class for whose "special benefit" the statute was enacted, then, if so, whether there is any indication of legislative intent to create or to deny a private remedy for violation of the act, and, if there is no indicia of legislative intent, whether the recognition of an implied right of action would advance the purposes of the act.[118] In certain instances, the Court has found intent to create a private remedy "where a statute was obviously enacted

---

[117] *See Lock v. Schreppler*, 426 A.2d 856, 864 (Del. Super. 1981), *overruled on other grounds by E. Com. Realty Corp. v. Fusco*, 654 A.2d 833 (Del. 1995).

[118] *See O'Neill v. Town of Middletown*, 2006 WL 205071, at *16 (Del. Ch. Jan. 18, 2006) (citing *Cort v. Ash*, 422 U.S. 66 (1975); then citing *Lock*, 426 A.2d at 864; then citing *Schuster v. Derocili*, 775 A.2d 1029, 1036 n.42 (Del. 2001); then citing *Brett v. Berkowitz*, 706 A.2d 509, 512 (Del. 1998); and then citing *Mann v. Oppenheimer & Co.*, 517 A.2d 1056, 1064–66 (Del. 1986)). Delaware caselaw does not appear to often approach the third prong of this test. For instance, *Brett* resolved the question of availability of a private right of action by finding that legislative intent was to protect the public, and did not reach the third prong. *Brett*, 702 A.2d at 512–13. Mann stated outright that where civil actions might arguably "further enforce the Act . . . this alone will not confer a private remedy." *Mann*, 517 A.2d at 1066 (citing *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 21–22 (1979)). Similarly, *O'Neill* addressed a then-recent United States Supreme Court precedent, *Alexander v. Sandoval*, which had narrowed its prior holding in *Cort v. Ash* to indicate that "[s]tatutory intent on" the issue of a private remedy "is determinative." *See O'Neill*, 2006 WL 205071, at *19 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001)).

for the protection of a designated class of individuals."[119]  But where statutes impose "general prohibitions," the legislative intent may be to "protect the public at large,"[120] therefore precluding the availability of a private right of action.[121]

Here, again, the Plaintiffs have utterly failed to attempt to demonstrate that any statutory violations, should they exist, confer on them a right of action via which they may invoke equity.  Accordingly, I do not address the statutes, codes, or regulations further, and proceed on the understanding that the Plaintiffs' rights are conferred via their contractual relationship with the Defendants, through the Declaration or otherwise.

*A. Unit Alterations*

As described in detail in the fact section above, Robinson remodeled her Unit #2 in part; the Plaintiffs challenge this action as violating both the Declaration and the Unit Property Act.  Less directly pled (but in any event addressed below), Yeilding also notes that if the remodeling fails or causes any repairs to become necessary to the common elements, as holder of a 34% interest in the condominium, he may be responsible for paying 34% of the repairs.

---

[119] *Brett*, 706 A.2d at 512 (citations omitted). For example, one Delaware Superior Court case found a private right of action to exist in a statute designed per its text to benefit employees and prospective employees. *See Heller v. Dover Warehouse Mkt., Inc.*, 515 A.2d 178, 180 (Del. Super. June 17, 1986).

[120] *Brett*, 706 A.2d at 512–13.

[121] *See id.*; *cf. Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 899 (Del. 1994) (discussing the "traditional" view that a duty to the public does not give rise to private rights of action, but then discussing the evolution of caselaw to loosen that traditional standard).

The causes of action underlying the request for injunctive relief appear to the Court to be breach of contract—the Declaration—and vindication of a statute—the Unit Property Act. As noted above, I consider the underlying action for invocation of injunctive relief to sound in contract.

Yeilding objects to Robinson's alterations to Unit #2 for two reasons: first, he posits that the alterations require an amendment to the Declaration and the Declaration Plan, and second, he expects that Robinson's changes have resulted in changes to the common elements prohibited under the Declaration.[122]

Robinson testified at trial that she originally sought to establish a second bedroom in her unit, but that she ultimately ended up with "an enlarged bedroom" with an adjoining office, which is not a "separate room[]."[123] Following trial, the Plaintiffs still challenge whether the remodeling affected the common elements of "plumbing, both water supply and sewer discharge."[124]

The pertinent section of the Declaration describes the following as common elements:

> The plumbing facilities installed for use outside the various individual units . . . . The sanitary sewage facilities, including waste pipes from the individual units . . . . Common plumbing, vent, and waste lines located in party walls . . . . Water system and pipe lines

---

[122] *See* Post-Tr. OB 3.
[123] Trial Tr. 123:24–124:4.
[124] Post-Tr. OB 4.

leading from the source of supply to the individual units.[125]

If Unit #2's remodeling made changes to any of these elements, Robinson would have needed to obtain "the written consent and approval of the council."[126]

I do not have the benefit of expert testimony with respect to this issue, so I am left to rely on the representations of the parties.[127] Yeilding purported to testify to the changes to Robinson's unit based on a "walk through" he did "one time" after asking "the construction fellow if I could walk through and take a couple pictures."[128] He noted that the kitchen and the bathroom had been moved as a result of the remodeling.[129]

Robinson testified to as much.[130] But beyond that confirmation, Robinson also testified that the plumbing comes into her unit at the same place as it did pre-remodel, and that the sewage and wastewater disposals go out at the same place as pre-remodel.[131] She also confirmed that nothing was done to the "common plumbing vent or waste lines in the walls."[132]

---

[125] JX 1, at Yeilding/Myers000357–358.

[126] *Id.* at Yeilding/Myers000366.

[127] I do have at my disposal JX 16, which contains the building permits Robinson obtained for her remodel. *See* JX 16. Neither party has stressed the importance of this permit application, and I frankly read it as inconclusive as to whether the common elements were altered. Because of the lack of reliance upon this document, I consider it only minimally in making my ultimate conclusion.

[128] Trial Tr. 23:18–24:9.

[129] *Id.*

[130] *Id.* at 124:13–125:4.

[131] *Id.* at 117:14–20.

[132] *Id.* at 118:12–14.

I find both parties' testimony credible. Fortunately, they are not in direct contradiction, and I interpret them so as to avoid implied contradiction.[133] Taking Robinson's testimony as true, then, I find that the common elements were not impermissibly altered.

This leaves the second basis upon which Yeilding sues in regard to Unit #2: the mismatch between the Declaration, the Declaration Plan, and Unit #2's layout in reality. I agree that at the very least, there is a lack of harmony between the Declaration *Plan* and Unit #2. It is less clear that there is a conflict between Unit #2 and the Declaration—as the testimony from various witnesses showed, it is certainly possible to describe the layout of Unit #2 in multiple ways, and therefore the description in the Declaration may be sufficient—but at any rate, the diagram in the Declaration Plan is no longer strictly accurate.[134]

Assuming, without deciding, that the Declaration Plan is a substantive part of the Declaration; that, if Unit #2's layout is inconsistent with the Declaration Plan, this causes some sort of contractual harm to Yeilding under the contractual

---

[133] *See Davidson v. Wilson*, 1869 WL 1361, at *308 (Del. Ch. Feb. 1, 1869) ("It is a rule of law as well as of charity that when the fact proved may be harmonized with the answer the Court shall rather do that than impute perjury to the defendant."); *cf. State v. Kisielewski*, 1991 WL 138365, at *1 (Del. Super. June 28, 1991) (harmonizing testimony of various witnesses); *Nationwide Mut. Ins. Co. v. Hockessin Const., Inc.*, 1996 WL 453325, at *4 (Del. Super. May 15, 1996) (same).

[134] I note that the Plaintiffs argue that this lack of accuracy violates the Unit Property Act, although how is unclear to me. At any event, for the reasons above, I find the statutory allegation insufficient to support relief.

25

relationship between himself and the HOA;[135] and that Yeilding has proven actual success on the question of whether Unit #2's layout is presently in conflict with the Declaration, I turn to the requested relief.

The Plaintiffs seek an injunction and suggest two forms for such injunction.[136] They first suggest an injunction requiring the HOA to amend the Declaration to properly describe Unit #2.[137] Alternately, they suggest that an injunction be entered requiring Unit #2 to be returned to its "pre-existing state."[138]

For the Plaintiffs to receive injunctive relief, I must find that the Plaintiffs have shown that irreparable harm will be suffered if such relief is not granted.[139] There has been no showing of threatened or actual irreparable harm in the record. When asked at trial, Yeilding noted a prior instance when a remodel was improperly undertaken and he was responsible for a portion of the resulting costs to fix common elements.[140] Yeilding's concern with respect to this point is understandable. When the prior repairs failed, due to his significant ownership interest in Pelican Cove, he had been compelled to pay 34% of the remediation costs (in proportion to his 34%

---

[135] To the extent this is argued in the post-trial briefing, I confess difficulty in locating and following the argument. The relief, however, does request a determination from the Court that the Unit #2 remodel was "in violation of the Declaration." *See* Post-Tr. OB 12.

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] *Christiana Town Ctr.*, 2003 WL 21314499, at *2.

[140] Trial Tr. 26:19–28:18.

ownership interest).[141]    However sympathetic this position, though, fear over *potential* future harm is not equivalent to irreparable harm necessary to injunctive relief.  More fundamentally, having determined that the alterations to Unit #2 do not alter common elements, the Plaintiffs' fear of future expense is presently unfounded.  This obviates consideration of a mandatory injunction to restore the prior configuration of the unit.  The Plaintiffs do not even suggest that any irreparable harm accompanies failure to enter the alternative injunction requested—that the Defendants be enjoined to amend the Declaration Plan.

Yeilding also notes that if load-bearing walls were moved, the unit above Unit #2 could suffer damage.[142]  True, perhaps, but no evidence was presented to suggest that a load-bearing wall was moved.  In fact, Robinson testified that no walls were removed.[143]

The Plaintiffs also request a declaratory judgment stating that the renovation of Unit #2 is in violation of both Delaware law[144] and the Declaration.  I have already

---

[141] *See supra* note 42 and accompanying text.
[142] Trial Tr. 27:11–28:18.
[143] *See supra* note 35 and accompanying text.
[144] *See* Post-Tr. OB 12.  In my reading of the opening post-trial briefing, the Plaintiffs seek a declaration that the Unit Property Act is the positive Delaware law being offended.  *See id.*  There was a brief mention at trial and again in the *reply* post-trial briefing that "Dewey Beach's Occupancy Ordinance" would be violated in the event that the Robinsons hosted their child's grandparents.  *See* Trial Tr. 20:13–21:6 (noting that Robinson had herself raised this issue and therefore was looking to add a second bedroom to her unit at some point during the remodel process); *see* Post-Tr. RB 10–11.  This issue is not properly before the Court.  The ordinance has not been cited, and the issue was not raised in the post-trial opening briefing such that the Defendants could respond.  Further, the issue is not ripe; it presupposes a hypothetical, and finally

noted above that the construction has, at least, created a conflict between reality and the Declaration Plan as illustrated. The right to a declaratory judgment, however, is a limited right. Where a concrete dispute exists, the Declaratory Judgment Act deviates from the common law to avoid the harsh result of having to await an actual injury to address the controversy.[145] The Plaintiffs, however, have failed to establish an actual controversy.[146] The following prerequisites must be satisfied for an actual controversy to exist: the controversy must (1) involve the rights or other legal relations of the party seeking declaratory relief; (2) be a controversy in which the claim is asserted against one who has an interest in contesting the claim; (3) be between parties whose interests are real and adverse; and (4) be ripe for judicial determination.[147]

The Plaintiffs have failed to show that their rights are at issue, that the Defendants have any legal interest in opposing any claim of right, or that the interests here are real and adverse. At most, the Plaintiffs have shown that the renovations have made the diagram on the Declaration Plan inaccurate. They would like a

---

is not supported by the testimony at trial. I do not consider the Dewey Beach Occupancy Ordinance further.

[145] *See, e.g.*, *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662 (Del. 1973) (citation omitted) ("[T]he basic purpose of the Declaratory Judgment Act is to enable the courts to adjudicate a controversy prior to the time when a remedy is traditionally available and, thus, to advance the stage at which a matter is traditionally justiciable.")

[146] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216–17 (Del. 2014) (citing 10 *Del. C.* § 6501; then citing *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989)).

[147] *Id.* at 1217 (citing *Stroud*, 552 A.2d at 479–80).

judgment saying that this is a legal wrong. They have failed (in light of my determination that the common elements are not affected by the renovations) to establish that *any right or interest they hold* is at issue. To be clear, an interest in a legal win for its own sake is insufficient foundation upon which to erect a declaratory judgment, and the Plaintiffs have shown no other.

*B. Balcony Obstructions*

The thrust of the Plaintiffs' arguments with respect to the balcony obstructions is that the presence of deck chairs and furniture upon the deck breaches a contract—specifically, that they breach the Declaration. The pertinent section of the Declaration reads:

> Use of all common elements shall in general be subject to such reasonable rules and regulations as may be from time to time adopted and amended . . . . *Without the prior written authorization of the council, no common element shall be obstructed* . . . . Furthermore, no towels, blankets, clothing, or other material of any kind shall be hung or draped or allowed to remain at or on any of the balconies, railings, porches, patios, docks, or catwalks of the property.[148]

The Plaintiffs contend that in placing deck chairs outside their units, the other unit owners are "obstruct[ing]" the common elements.[149] The Declaration also

---

[148] JX 1, at Yeilding/Myers000360–61 (emphasis added).
[149] *See* Post-Tr. OB 13.

provides: "[a]ny conflicts between the Declaration and Code of Regulations shall, if not otherwise reconciliable [sic], be resolved in favor of the Declaration."[150]

The Code of Regulations, on the topic, states as follows: "A unit owner shall not place or cause to be placed in any common element area any furniture, packages, or objects of any kind unless prior written consent from the Council is provided to the unit owner."[151]  This language is reflective of an update made to the original Code of Regulations by the HOA in May 2020.[152]  That amendment was recorded as found at joint exhibit 23.[153]

As identified in the fact section above, the deck constitutes a common element.[154]  The main questions are whether the deck chairs other residents have placed upon the deck are impermissible obstructions under the text of the Declaration and the Code of Regulations, and whether a written exception has been provided.

The Plaintiffs' argument is that the Declaration requires a two-thirds vote in order to be amended (which would require the Yeildings' approval, which has not been granted to date[155]), and that if the Declaration conflicts in any way with the Code of Regulations, the Declaration must govern.  Both of these theories are

---

[150] JX 1, at Yeilding/Myers000365.
[151] JX 23.
[152] See JX 21.
[153] JX 23.
[154] See supra note 44 and accompanying text.
[155] See JX 21.

grounded in the text of the Declaration.[156]  But, in my view, the Plaintiffs misread the Declaration.

The Declaration calls for "prior written authorization of the council" in order for obstructions such as the deck chairs to be allowed to linger.[157]  But the HOA *has* provided prior written authorization, following the amendment to the Code of Regulations.[158]  On May 4, 2020, the President of the HOA signed a writing reading:

> In accordance with Article V, Section 4, Use of Common Elements, of the Code of Regulations for Pelican Cove Condominium, chairs, tables, and other small objects may be located on the upstairs balcony in front of Units 4, 5, & 6, in a manner that does not unreasonably restrict ingress, egress, or passage, is hereby approved by Pelican Cove Condominium Council, effective May 2, 2020.[159]

The Plaintiffs have not provided any reason why the May 4 writing is insufficient to confer authorization, other than their belief that the *Declaration* must have been the forum for providing written authorization.[160]  But the Declaration itself does not specify that the prior written authorization take the form of an amendment to the Declaration.[161]  And an amendment to the Code of Regulations requires only majority support, rather than two-thirds support.[162]  The meeting

---

[156] *See* JX 1, at Yeilding/Myers000365; *see id.* at Yeilding/Myers000364.
[157] *Id.* at Yeilding/Myers000360.
[158] *See, e.g.*, JX 23, JX 21.
[159] JX 21.  The somewhat confusing syntax of the authorization is the original.  *See id.*
[160] Post-Tr. OB 7.
[161] *See* JX 1, at Yeilding/Myers000360–361.
[162] *See* JX 5, at Yeilding/Myers000382.

31

minutes from the HOA's discussion indicate that the other six unit owners all voted in favor of permitting furniture on the deck so long as ingress and egress remained possible, thus constituting a majority sufficient to amend the Code of Regulations.[163] It follows that the Code of Regulations in its current form, and the May 4 notice, together provide adequate prior written authorization under an objective reading of the text.[164]

The Plaintiffs' post-trial reply briefing does not strongly press the question of whether a conflict exists between the Declaration and the Code of Regulations at present, but the issue was raised in the post-trial opening brief.[165] I address the potential conflict concisely for completeness's sake. To my mind, any potential conflict between the Declaration and the Code of Regulations regarding obstruction of the deck as a common element is, as the Declaration provides, reconcilable. The Declaration only controls if the Code of Regulations is in irreconcilable conflict therewith. If one reads—as I do—the amendment to the Code of Regulations as *performative of* the Declaration's requirement that prior written authorization of the HOA be obtained, then it is apparent that no irreconcilable conflict exists.

The Plaintiffs have not proven a breach of contract with respect to the so-called balcony obstructions. As the underlying claim fails on the merits, I do not

---

[163] *See* JX 21.
[164] *See* JX 23.
[165] *See* Post-Tr. OB 6–7; Trial Tr. 32:2–10.

reach the issue of the Plaintiffs' requested injunctive relief. I do note that based on the evidence, it is unlikely that either the irreparable harm or balancing requirements of the test for injunctive relief are satisfied here.

### C. The Pelican Cove Marina

The marina depth issue primarily relates to the navigability of slips under the Declaration's applicable definition. The Declaration indicates that navigability for the purposes of the agreement is "18 inches of water at mean low tide."[166] The predicate issue to be established upon the merits is whether the actual depth of the marina falls short of 18 inches and constitutes a breach of contract, as the Declaration forms an "ordinary contract" among the unit owners.[167]

As noted in the facts above, if a slip becomes non-navigable, the *unit using that slip* may notify the HOA in writing, presumably implying a right to relief— dredging or some other "mutually agreeable" action—regarding that slip.[168] Yeilding is assigned slip 5 by the HOA,[169] Unit #5 is assigned slip 1, Unit #4 is assigned slip 2, and Unit #2 is assigned slip 3.[170]

The parties presented two different expert witnesses at trial. Plitko, the Plaintiffs' expert, provided a survey that demonstrated a depth of under 18 inches in

---

[166] JX 4, at Yeilding/Myers000411.
[167] *See Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 5 (Del. 2002).
[168] JX 4, at Yeilding/Myers000411.
[169] *See* Trial Tr. 37:18–38:2.
[170] JX 20.

slips 1 and 2 at mean low tide.[171]  Plitko's survey also demonstrated that slip 5 had

sufficient depth to be navigable under the definition in the Declaration.[172]  The

Defendants' expert, Maurmeyer, also prepared a report that assessed the depth of

each of the Pelican Cove slips.[173]  Maurmeyer's report also showed that slip 5—and

all other slips—were navigable per the terms of the Declaration.[174]

Because Yeilding is assigned to slip 5, he does not have a right to enforce the

navigability or lack thereof in slips 1 and 2.  Both of the expert witnesses showed

that slip 5, assigned to Yeilding, was sufficiently navigable.[175]  Therefore, he has not

shown a breach of contract under the Declaration.

The Plaintiffs challenge this conclusion, arguing that the Third Amendment

to the Declaration "guarantees" to all unit owners "seven (7) navigable boat slips."[176]

But this is not how the Declaration reads.  The Declaration states as follows:

> The pier has 7 boat slips that make up the marina. . . .
> Each unit is entitled to *one* navigable boat slip. . . . *Should
> a unit using a slip* that has become un-navigable *wish* to
> have the slip returned to a navigable condition, the unit
> shall notify the Condominium in writing. . . .  The right of
> each unit to *a* navigable boat slip is guaranteed by this
> agreement.[177]

---

[171] JX 8.

[172] *See id.*

[173] *See* JX 18.

[174] *See id.*

[175] *See* JX 8; JX 18.

[176] *See* Post-Tr. OB 8.

[177] JX 4, at Yeilding/Myers000411 (emphasis added).

Nowhere does the text of the Declaration guarantee *seven navigable slips* to any *one* unit owner, or to the collective of owners. Rather, the Declaration clarifies in two instances that "[e]ach unit is entitled to one navigable boat slip" and that the "right of each unit to *a* navigable boat slip" is guaranteed.[178] In fact, the contractual language contemplates that unit owners may waive the right to a navigable slip. Yeilding cannot assert a right to *seven* navigable boat slips; he can only assert a right with respect to the slip assigned to him—slip 5. As discussed above, slip 5 is navigable. Therefore, any breach of contract claim cannot be found meritorious.

The Plaintiffs have separately intimated that the HOA's application to renew its subaqueous lease with DNREC was made lacking proper authority. The predicate claim is unclear.[179] The Plaintiffs appear to suggest that the HOA's actions were not pursuant to a proper vote, and that "committing the owners" to a renewal thereby—including Yeilding and his 34% interest—puts the Plaintiffs (and other unit owners) on the hook for the costs of maintenance, repairs, insurance, and storm damage—the costs of maintaining a marina—without a vote.[180] This argument, in light of the Plaintiffs' other arguments regarding the marina, fails a sniff test. *Yeilding himself* testified that "one of the main reasons why we purchased the unit,

---

[178] *See id.* (emphasis added).
[179] The post-trial reply brief attempts to make an argument for a breach of contract based on the potential subaqueous lease number and lease duration; this argument I confess I cannot follow. *See* Post-Tr. RB 16; *see also* JX 4, at Yeilding/Myers000411.
[180] Stip. at I ¶ 2a; Post-Tr. RB 16.

is because of the marina."[181]  A substantial part of this litigation involved *Yeilding's* argument that the Plaintiffs have a right to have the entire marina dredged, sufficient to make each slip navigable.  As the Plaintiffs also point out, the Declaration provides for the maintenance of the marina for the unit owners.[182]  Yeilding's separate argument that the subaqueous lease renewal application was *ultra vires* because he was denied a right to vote against the authority of the HOA to apply for a permit to maintain the (Declaration-required) marina is insufficient to support injunctive relief.  Given the Plaintiffs' request that I enjoin the HOA to dredge the marina,[183] it is unclear what remedy they even seek in connection with the HOA's subaqueous lease renewal application.  And while the Plaintiffs also argue defects in the renewal application itself, if true this still leaves the question of what right the Plaintiffs seek to vindicate in this context, or how equity may vindicate that right.

No cogent claim appears to have been made here, whether for breach of contract or otherwise.[184]  Because no meritorious claim has been proven by the

---

[181] Trial Tr. 33:2–9.
[182] JX 4, at Yeilding/Myers000411.
[183] Post-Tr. OB 14.
[184] Yeilding testified that he is dissatisfied with slip 5 because it does not provide space for a boat lift. *See* Trial Tr. 34:15–24. The Declaration does not guarantee ability to install a boat lift, however.  *See* JX 4, at Yeilding/Myers000411.  Yeilding also complains that his access to the finger pier associated with slip 5—and thus access to his boat—is partially blocked or made less convenient by a neighbor's boat lift. *See* Trial Tr. 35:20–24. Yeilding has not sought relief on this ground, in any event.

Plaintiffs with respect to the marina depth or the subaqueous lease renewal application, their request for related injunctive relief is denied.

### D. Common Area Rental Rules

Finally, the Plaintiffs seek a negative injunction enjoining the HOA from posting or enforcing the Rental Rules, especially Rule 3.[185]

In support, the Plaintiffs argue that the Rental Rules violate both the Declaration and the Unit Properties Act. The argument focuses wholly on Rule 3, which reads: "No parties or large social gatherings. People other than those in the rental party are not allowed on the property. No visitors are allowed."[186] For the reasons articulated above, my analysis focuses on the contractual argument.[187]

The Declaration states that the "undivided interest in the common elements . . . *shall not be separated* from the unit to which said interest appertains, *and shall be . . . leased . . .* with the unit even though such interest is not expressly mentioned or described in a conveyance or instrument."[188] In chief, the Plaintiffs contend that each lessee—including those renters to whom the Yeildings "lease"[189]

---

[185] Post-Tr. OB 14. It is not clear that the Plaintiffs solely challenge Rule 3, but it is the sole focus of their arguments. *See id.* ("The relief requested on this issue is a negative injunction enjoining the Council from posting or enforcing the rule limiting tenants' rights.").

[186] JX 22.

[187] The statutory argument is largely duplicative of the allegations of breach of the Declaration, I note.

[188] JX 1, at Yeilding/Myers000359 (emphasis added).

[189] I note that the terms renter/lessee/tenant, rent/lease, and other variations appear to have been used somewhat interchangeably both in the previous litigation and in the briefing and argument here. *See, e.g., Council of Ass'n of Unit Owners of Pelican Cove Condo. v. Yeilding*, 2019 WL 2339531, at *5 (Del. Ch. June 3, 2019). No real briefing has been attempted on the precise issue

37

Unit #7 at various times throughout the year—is entitled to equal use of the common elements with other lessees and owners.[190] The Plaintiffs read Rule 3 (denominated as a *Rental Rule*) to treat owners differently from tenants/lessees, by allowing owners to invite guests to common-area parties, while denying that use to renters.[191] Per the Plaintiffs, according to the Declaration, unit owners and renters must have the same rights to the common areas.[192] By prohibiting use of the common area by renters' "guests," while not so limiting owners' guests, the Defendants have breached the Declaration via the Rental Rules.[193]

The Plaintiffs' reading of the Rental Rules appears, at first blush, to be strictly based upon the title ("PELICAN COVE BEACH HOUSE *RENTAL RULES*").[194] The Defendants' response to this count is largely predicated upon the supposition that the rules in fact treat tenants and owners identically.[195] But the joint exhibit describing the Rental Rules submitted to the Court specifies at the bottom of the page, "**These rules apply to renter [sic] and are not applicable to Pelican Cove

---

of the relationship engendered between Yeilding and those who lease and/or rent Unit #7 from him upon occasion, though the Plaintiffs assert the relationship rises to the level of a "landlord-tenant relationship." *See* Post-Tr. RB 19. It seems to me that argument on this issue could have been helpful, as it is not entirely clear that Yeilding's renters are in fact contractual *lessees*, but as the issue has not been pursued, I assume, without finding, that those renting from the Yeildings are "lessees."

[190] See Post-Tr. OB 11, though I note that most of this discussion is in the context of the statutory challenge to the Rental Rules under the Unit Property Act.

[191] *See id.*

[192] *See id.* at 12.

[193] *See, e.g.*, Post-Tr. RB 19.

[194] JX 22 (emphasis added).

[195] Post-Tr. AB 22.

owners**."[196]   The joint exhibit makes it clear that the Defendants' theory is inaccurate.[197]   Accordingly, I find that the Rental Rules treat short-term renters' rights to the common areas as inferior to that of owners.  I assume that a short-term rental is a type of "lease" under the terms of the Declaration.[198]

For purposes of this analysis, then, I find the Rental Rules, at Rule 3, to be in conflict with the Declaration.  I turn to the request for injunctive relief.

The only basis for irreparable harm that the Plaintiffs have posited is the Rental Rules' interference with a property right.[199]   And indeed, this Court has held before that interference with a property right itself constitutes irreparable harm.[200]   Here, however, the harm, if any, is more attenuated.  The Plaintiffs themselves are owners, and Rule 3 does not impinge on their right to invite guests to bacchanals in the common area—in fact it is their purported freedom to engage in common-area revelry, as owners, that sets up the impermissible distinction regarding their tenants.  If the Plaintiffs are suffering harm, then, it must be because their *tenants'* rights to

---

[196] JX 22.

[197] I do note for fairness's sake that the Code of Regulations, which *does* act upon the owners, identifies "Rules of Conduct" somewhat similar to the third Rental Rule, requiring residents to exercise "extreme care not to make noises or use musical instruments, radios, televisions, or amplifie[] in such volume as to disturb other residents."  JX 5, at Yeilding/Myers000377.  So, while the Code of Regulations does not specifically prohibit the owners from throwing common-area parties, the intent is likely similar across the different provisions.

[198] *See supra* note 188.

[199] Post-Tr. RB 20; Compl. ¶ 72; Post-Tr. OB 15.

[200] *See, e.g.*, *Vansant v. Ocean Dunes Condo. Council Inc.*, 2014 WL 718058, at *1 (Del. Ch. Feb. 26, 2014); *Kusumi v. Sproesser*, 2021 WL 4059960, at *3 n.15 (Del. Ch. Apr. 7, 2021); *Kuhns v. Bruce A. Hiler Delaware QPRT*, 2014 WL 1292860, at *23 (Del. Ch. Mar. 31, 2014); *Bogia v. Kleiner*, 2019 WL 3761647, at *9 (Del. Ch. Aug. 8, 2019).

such bacchanals are an important consideration for rentals, and thus Rule 3 is harming the Plaintiffs' *rental business*. The record is silent in support of this contention;[201] in fact, the Plaintiffs' own rental agent has stated the opposite to the HOA, noting that "renters now a days [sic] are savvy to the restrictions and know how to get around them."[202] This statement at least suggests that the number of renters who decide *not* to rent Unit #7 as a result of the Rental Rules, if any, is minimal. In any event, such a loss to the Plaintiffs could presumably be remedied by damages in the case of a discrete inability to rent.[203] On the record created at trial, there is no basis to conclude, even if the distinction drawn against tenants in the Rental Rules violates the Declaration, that the Plaintiffs will suffer irreparable harm absent an injunction.

If this were a better world, I would be confident that the parties[204] could agree to a minor modification of the Rental Rules that would permit restriction of the kind of anti-social behavior obnoxious to the HOA, while still in compliance with the

---

[201] The closest the Plaintiffs come to providing evidence on this front is Yeilding's testimony that some renters have been "contacted by owners, that were going to have some people over." Trial Tr. 46:16–47:10. But there is no allegation that any rental business was lost as a result of this contact. *See id.*

[202] JX 20.

[203] Of course, if the Plaintiffs had provided persuasive evidence that their rental business in their unit was being harmed in a way tangible but unquantifiable, irreparable harm would have been shown and would, perhaps, justify injunction. No such showing was proven here.

[204]To be "neighborly," per Mr. Webster, is to be friendly. "Neighbor" is the root of "neighborly." The connection between the words, alas, is tenuous.

Declaration. Sad experience has disabused me of such confidence. Nonetheless, I cannot provide the relief in equity the Plaintiffs seek here.

### III. CONCLUSION

The Plaintiffs' requests for injunctive relief and declaratory judgment are each individually DENIED for the foregoing reasons. The parties should submit a form of order.